UNITED STATES v. THE JANE GRAY.

(District Court, N. D. California. December 31, 1896.)

No. 1,538.

1. SEAL FISHERIES—HUNTING NEAR PRIBILOV ISLANDS—PRESUMPTION—EVIDENCE.

The act of April 6, 1894, for the protection of fur seal within 60 miles of the Pribilov Islands, provides, in effect, in section 10, that, if any licensed vessel equipped for seal hunting be found within the prohibited zone, it shall be presumed that she and her equipments were used in violation of the act, until otherwise proved. *Held*, that where the log of a vessel seized showed that on a certain prior date she was within the prohibited zone but further showed that the sea was very rough, and her captain testified that in fact no sealing was done that day, the proofs were insufficient to justify condemnation.

2. SAME—DUTY OF MASTER—RECORD OF POSITIONS.

The fact that a sealing vessel is near the prohibited zone should put her master upon the alert to keep a full and accurate record of his positions, courses, and distances, that he may not pass the line, and that, by his records and charts, he may be able, if called upon, to demonstrate clearly that he was not within the prohibited area.

3. SAME—BOATS INSIDE PROHIBITED ZONE.

A vessel and her cargo, etc., are subject to forfeiture, if her boats go inside the prohibited area and take seal there, even though she herself remain just outside the line.

4. SAME—FORFEITURE.

Vessel, cargo, and implements condemned for being used, at the time of seizure, hunting fur seal within the prohibited area.

Libel of information to condemn and forfeit the American schooner Jane Gray, her tackle, apparel, furniture, boats, and cargo, consisting of 257 fur-seal skins, 30 bags of salt, 16 spear poles, and 34 spear heads, for a violation of section 1 of the act of April 6, 1894, as amended by the act of April 24, 1894, in killing and pursuing seals in the waters surrounding the Pribilov Islands, within a zone of 60 geographical miles around said islands. The libel contained two counts,—the first, for pursuing fur seals within the prohibited zone on August 15, 1896, and the second for killing fur seals within the prohibited zone on August 22, 1896.

Andros & Frank, for claimant.

H. S. Foote, U. S. Dist. Atty., and Samuel Knight, Asst. U. S. Dist. Atty.

MORROW, District Judge. The libel of information in this case is brought under section 1 of the act of April 6, 1894, as amended by the act of April 24, 1894, and seeks to obtain the condemnation

and forfeiture of the American schooner Jane Gray, her tackle, apparel, furniture, boats, and cargo, consisting of 257 fur-seal skins, 30 bags of salt, 16 spear poles, and 34 spear heads. These acts were passed to give effect to the award rendered by the tribunal of arbitration, at Paris, under the treaty between the United States and Great Britain concluded at Washington, February 29, 1892 (see 27 Stat. p. 101), for the purpose of submitting to arbitration certain questions concerning the preservation of the fur seals. The first article of this award reads:

"The governments of the United States and Great Britain shall forbid their citizens and subjects respectively to kill, capture, or pursue at any time, and in any manner whatever, the animals commonly called fur seals, within a zone of sixty miles around the Pribilov Islands, inclusive of the territorial waters. The miles mentioned in the preceding paragraph are geographical miles, of sixty to a degree of latitude." 28 Stat. p. 52.

Section 1 of the act of April 6, 1894, as amended by the act of April 24, 1894, which were passed to give effect to the article just recited, reads as follows:

"That no citizen of the United States, or person owing the duty of obedience to the laws or the treaties of the United States, nor any person belonging to or on board of a vessel of the United States, shall kill, capture, or pursue, at any time, or in any manner whatever, outside of territorial waters, any fur seal in the waters surrounding the Pribilov Islands within a zone of sixty geographical miles (sixty to a degree of latitude) around said islands, inclusive of the territorial waters." 28 Stat. p. 64.

The penalty for a violation of this section as amended is found in section 8 of the act of April 6, 1894 (28 Stat. p. 54), which provides:

"That, * * * every person guilty of a violation of the provisions of this act, or of the regulations made thereunder, shall for each offense be fined not less than two hundred dollars, or imprisoned not more than six months, or both; and all vessels, their tackle, apparel, furniture, and cargo, at any time used or employed in violation of this act, or of the regulations made thereunder, shall be forfeited to the United States."

Section 9 of the same act provides:

"That any violation of this act, or of the regulations made thereunder, may be prosecuted either in the district court of Alaska or in any district court of the United States in California, Oregon, or Washington."

Section 11 provides that it shall be the duty of the president to cause a sufficient naval force to cruise in the waters to which the act is applicable, to enforce its provisions, etc.

The libel of information contains two counts. The first count, as amended by the amendment to the libel filed October 27, 1896, charges that the schooner Jane Gray, in violation of the act (as amended) referred to, was engaged on the 15th day of August, 1896, in pursuing fur seals within the prohibited zone. The second count charges that the schooner was engaged on the 22d of August, 1896, in killing, and did kill, a certain number of fur seals—some 21 in number—within the prohibited area. The answer denies that the schooner was engaged in pursuing fur seals, or in killing, or that it did kill, 21 fur seals, or any fur seals whatever, within the prohibited area. Exceptions were also presented, with the answer, to the sufficiency of the libel, but these were reserved until the evi-

dence in the case had been presented, when they were renewed, both as to the libel and the evidence in support thereof. They are clearly untenable, and must be overruled. The only questions involved in the case, under the issues made by the parties, are of fact: (1) Whether or not the master, officers, and crew of the schooner used or employed her on the 15th of August, 1896, in pursuing fur seals within the prohibited area; and (2) whether or not the master, officers, and crew of the schooner used or employed her in killing fur seals on the 22d of August, 1896, within the prohibited area,— that is, within 60 geographical miles of the Pribilov Islands.

The Corwin is a vessel employed in the revenue cutter service of the United States, detailed for duty in the Behring Sea, and, at the particular time covered by the libel, was engaged in patrolling the outside limit of the prohibited zone around the Pribilov Islands. The Jane Gray is an American schooner, duly registered, and of the burden of 107.07 tons net. She left the port of San Francisco on or about the 19th of December, 1895, was commanded by N. Hodgson, and was licensed and engaged in a sealing voyage. When seized, she had on board 257 fur-seal skins, 30 bags of salt, 16 spear poles and 34 spear heads. The testimony of Mr. D. F. A. De Otte, the navigating officer of the Corwin, and of Mr. C. S. Craig, the second lieutenant, who boarded the schooner and made the seizure, is to the effect that the schooner Jane Gray was within the prohibited area on both of the dates alleged in the libel. It is not claimed, however, by the government, that the Corwin detected the Jane Gray pursuing seals on the 15th of August, 1896. As a matter of fact, she did not sight the schooner until the evening of the 22d of August, 1896. But entries with reference to the noon position of the schooner on that day, made both in the journal and official sealing log of that vessel, show that she was within the prohibited area on the 15th of August, 1896. Her latitude and longitude, derived from the noonday observation, are entered in both logs as 56° north latitude and 171° .04' west longitude, and this is not denied or disputed by the captain. This would place her within the prohibited area. It is contended on the part of the government that, it having been established that the schooner was within the prohibited area on the day referred to, the schooner is liable to forfeiture; the presumption being, under the second clause of section 10 of the act of April 6, 1894, supra, that "the vessel in the one case and the apparatus or implements in the other was or were used in violation of this act until it is otherwise sufficiently proved." On the part of the claimant it is contended that this presumption does not apply to the Jane Gray, as she was a licensed vessel, and, even if it did, that it has been removed by the testimony of the captain. The latter testified unequivocally that he was not engaged on the 15th of August, 1896, in pursuing any seal whatever; that the weather prevailing on that day would not permit it; that he did not have any boats out on that day, and that sealing is done only from the boats, excepting in fine weather, when, once in a while, a seal will come close enough to the vessel to be caught. The entries in the journal and official sealing log confirm the captain's statement as to the squally and stormy nature of the weather.

In the journal (U. S. Exhibit 5) are the entries, under date of August 15, 1896:

"Moderating. Very rough sea. Vessel laboring heavy into the trough. Set all sails, and steering to the S. E. by E. Blowing fresh. Took in mainsail and flying jib. At 6 p. m., hove to."

It is true that we have nothing but the captain's testimony on this point, and no corroboration except the entries in the journal and official sealing log. The captain has an interest in saving the schooner from forfeiture, and his testimony, in some respects, does not seem very reliable. I am of opinion, however, that there is not sufficient proof of her having been engaged in the pursuit of seals, under the first count of the libel of information, on the 15th of August, 1896, to justify her condemnation and forfeiture.

We come now to the second count contained in the libel. The testimony of the officers of the Corwin is positive, unequivocal, and convincing that the schooner Jane Gray was found within the prohibited area on the evening of August 22, 1896. The calculations of the respective positions of the cutter and the schooner when the seizure was made fully confirm this testimony. Different methods of calculating the position of the schooner at the time of the seizure vary, to some extent, the distance within the outer line of the limit at which she was seized, but they all place her within the prohibited zone. The government introduced in evidence the chart used by the officers of the Corwin on the occasion of this seizure, which shows the courses pursued by the Corwin from the time she left St. George Island, on the evening of August 21st, to the time of the seizure. A facsimile of this chart was also introduced, on which was traced only the courses of the Corwin on this particular occasion, so that the place of seizure might more easily and readily be ascertained and distinguished, as U. S. Exhibit 3 contained many other courses, the results of other cruises. The different positions of the Jane Gray, according to the several methods of calculating her position, were marked on this chart, and the distances within the prohibited area are, respectively, as follows: By chart plotting, the position of the schooner at the time of the seizure is fixed at about $1\frac{1}{2}$ miles inside the outer limit of the prohibited zone, and is indicated on U. S. Exhibit 2 by the abbreviation "Ch." By dead reckoning, she was nearly 2 miles within the prohibited area, indicated on U. S. Exhibit 2 by the letters "D. R." By the forenoon and afternoon sights, she was about $4\frac{1}{2}$ miles inside, indicated on U. S. Exhibit 2 by the letters, respectively, "A. M. Lo." and "J. G. P. M. Lo." These various calculations were verified by the officers who testified, and a severe cross-examination did not shake the correctness, materially, of their computations. At the time the Jane Gray was seized she had eight small boats out, fitted and manned for seal-hunting purposes. These were returning from the day's hunt at the time. The cutter picked up two of the boats before seizing the schooner, in one of which a dead seal was found. On the deck of the schooner were the bodies of several dead seals. The first boat was picked up at 169° 58' west longitude, and 55° 39' north latitude. and the second, shortly after, at 169° 57' 30" west longitude,

and 55° 38' north latitude. These positions were worked out from the afternoon sight. Both of these boats were therefore within the prohibited area.

The testimony of the officers of the Corwin as to the circumstances preceding and attending the seizure is substantially as follows: C. S. Craig, the second lieutenant of the Corwin, testified: That he had the first watch of the Corwin when she left St. George Island, at 8:10 of the evening of August 21, 1896. His watch lasted from 8 to 12 that night. When the Corwin left St. George Island, he took her bearings. He took Dalnoi point when it was abeam, and took the log at that time. Dalnoi point is a point on the western extremity of St. George Island, which is frequently used by navigators in taking their bearings for departure. The witness further testified: That he had the afternoon watch on the 22d day of August, 1896,—the day of the seizure. That the day was calm and pleasant, with a smooth sea and light southwest breezes. That it freshened up after 4 o'clock in the afternoon. That he went below when his watch had expired, but came up when it was reported that a schooner had been sighted ahead. That he saw the Jane Gray about 5:30 o'clock. She was then about 10 miles ahead, and under sail, heading to the southward and westward, and, as he thinks, on the port tack. That, after proceeding further along, they sighted her boats to the southward slightly. They decided that the boats were within the limit, and they stood towards them, picked them up, and took them in tow. The boats were sealing boats. Each of them had a hunter and boat puller. The witness saw a dead seal in one of them. In the meantime the Jane Gray was standing down to the southward and westward, under all sail. They steamed towards her, and she hove to. They cast off her boats, and the witness was sent, with another officer, to board and seize her. He went on board, and asked the captain for his papers, and told him he was within the prohibited area, and to give him the ship's papers, the sealing log, journal, and rough log or slate, or anything he had to determine his position upon that day. The captain said he was outside. The witness replied that the Corwin put him inside, and that he would have to see the captain of the Corwin about it. The witness noticed a number of dead seals lying on the main deck. He further testified that the captain of the Jane Gray admitted to him that the longitude of the Corwin agreed with his, but he claimed that the latitude did not; that he had been placed too much to the northward. The witness then testified that he remained in charge of the Jane Gray, and assisted in navigating her to Dutch Harbor, where they arrived late in the evening of the 24th of August, 1896. The schooner was towed part of the way to Dutch Harbor by the Corwin. The witness stated the various courses steered and distances covered on the trip to Dutch Harbor, and from these he was able, also, to determine that the position of the seizure, as fixed by the officers of the Corwin, was more nearly correct than that claimed by the captain of the schooner; the position claimed by the latter being considerably to the southward,—from five to seven miles to the southward. It is true that this witness, in testifying to his

calculations of the courses and distances of the schooner from the place of seizure to Dutch Harbor, made an error in his starting point; that is, he read the schooner's log "9," when he should have read it "0." This error would result in placing the schooner's position to the southward from five to seven miles; but, in the course of his examination, the witness corrected himself, and explained satisfactorily how the mistake occurred. Reading the log as "9," instead of "0," would have made his calculations as to the place of seizure differ to the extent of some six miles from that given by Mr. De Otte. With this correction, their calculations would agree. The testimony of Mr. De Otte, the navigating officer of the Corwin, was to the effect: That the Corwin left St. George Island on the evening of the 21st of August, between 7 and 8 o'clock. That they ran down to the western limit of the prohibited zone. That they then changed their course eastward, and ran that course the rest of his watch; standing along the line inside the limit, to determine whether any vessels were within the prohibited area. That they noticed some vessels to the southward and westward, but determined that they were out of the limit. That they first sighted the Jane Gray about 4:30 o'clock in the afternoon of the 22d of August. That, so far as they could see, the schooner was standing to the southward. That the sea was calm, with light breezes. That in the afternoon the breezes were southerly, and the wind increased slightly about 4 o'clock, and hauled more to the eastward. That, after sighting the schooner, they sighted several small boats. At 5:20 p. m. they headed for the boats. At 5:57, stopped, and took the first boat of the Jane Gray in tow. He thinks that this is the boat that had the dead seal in it. At 6:10, stopped and took another small boat in tow. They then proceeded to the schooner herself, stopped at 6:45 o'clock, and Second Lieutenant Craig was sent on board. There were other small boats in the immediate neighborhood of the schooner. Some of them reached the schooner while the Corwin was alongside. The witness further testified to a conversation he had with Capt. Hodgson at the time the schooner was seized relative to her position. He stated: That the captain asked him for his longitude and that he admitted that it corresponded nearly with his. The captain of the schooner also said he would drop a line overboard and take soundings. That the depth of the water at that point, according to the chart introduced in evidence, was about 1,626 fathoms. The witness then explained the various methods of calculation adopted by him in determining that the schooner Jane Gray was within the prohibited area. These have already been referred to. The captain of the schooner denies that he was within the prohibited area, engaged in killing seals, but his testimony is unsatisfactory and unreliable. He claims that from the time he took his noon observation, on the 22d day of August, 1896, to the time of the seizure, he was heading to the southward; that he was heading to the southwest from about 12 o'clock until 4 o'clock in the afternoon, under foresail; that the wind was E. N. E.; that the wind freshened about 1 o'clock; that it was not enough to keep the sails steady, and he let her lay to; that at 4

o'clock it freshened up a little more, and he set the mainsail and jib; that he then stood S. S. W. and S. by W. about five miles, up to the time of the seizure; that he held his position, or did not make any headway after his noonday observation, up to 4 o'clock; that the forces that held him in that position were, to use his own words, as follows:

"The wind was from eastward and northward, and the swell was from the southwest. They just about counterbalanced one another, and the swell threw the vessel back about the same as she went ahead."

On cross-examination the captain admitted that he had made, in his estimate of the place of seizure, no allowance for a drift to the north, the direction in which the current sets. In a statement introduced by the government, and marked "U. S. Exhibit 11," which the captain prepared himself on the evening of the 22d of August, after the seizure had taken place, as a substitute for the lack of entries in the log of that date, he says:

"Got sight at noon, and found latitude to be 55° 32', and long. 169° 35' 30"."

This would place the schooner at 12 o'clock noon of the 22d day of August, 1896, according to his own calculation, near the outside limit of the prohibited zone; and this fact, in connection with the further fact that he admits having made no allowance for a drift in latitude, would seem to confirm the testimony and calculations made by the officers of the Corwin, that the schooner was at the time of the seizure, and had been for some time previous thereto, within the prohibited area. In other words, the schooner had from 12 o'clock noon till 4 o'clock in which to drift northward and into the prohibited area, although the captain stoutly maintains that he held his position by virtue of the fact that the wind or breeze then prevailing counteracted the force of the current or swell. But it is significant that, in his statement prepared at the time of the seizure, he states that a calm prevailed at 10 a. m., and there is nothing further in the statement to show that there was any particular breeze or wind from 10 a. m. until 4 p. m., when the statement reads that a "light breeze from E. N. E." arose. If there was a calm from 10 to 4 p. m. it is difficult to see how the captain's testimony, that the force of the wind counteracted the force of the current and kept him in the same position, can be accepted as correct and in accordance with the true state of facts. In this respect, his statement prepared at the time, and when such an important factor as the wind would not have been omitted, is in direct conflict with his testimony on the stand, wherein he states that the wind was from the E. N. E. from about 12 o'clock to 4 p. m., and that it freshened up a little at 1 o'clock. There are no entries in his journal and official sealing log for the 22d, and very few for the 21st, the day preceding. The captain claims that this is due to the fact that he surrendered all the ship's books and papers to the seizing officer on the evening of the 22d of August. He sought to fix the place of seizure by a noon observation he claims to have made on the 22d of August, and by certain estimates and allowances for drifting, wind, and courses. In fixing on the chart introduced by claimant (claimant's

Exhibit 1), the place of seizure (marked "3" on the chart), which he puts outside of the limit, he admitted to the court that it was chiefly an estimate, and not from the log. Testimony of this character, as against the positive and clear testimony of the officers of the Corwin, confirmed by four or five approved methods of establishing the correctness of their statements, cannot, obviously, be accepted or relied on. The captain admits that the small boats put out from his vessel that morning at 6 or 7 a. m. for the purpose of hunting seals, and that they were returning to the vessel when she was seized. It is not denied that several dead seals were found on the deck, and that there was a dead seal in one of the boats which were seized within the prohibited area. He claims that the boats put off to the southward, and that the schooner, from his noon observation to the time of the seizure, was heading to the southward; but the incontestable fact remains that the two boats first seized were within the prohibited area, and were making for the schooner. The captain does not attempt to deny or dispute that the two boats referred to were within the limit. On recross-examination he was asked, "Do you know the latitude and longitude of either of the two boats that were picked up by the Corwin?" to which he replied: "No, sir: I could not say as to that." Another singular fact is that although the captain's journal for the 14th, 15th, 16th, 17th, 18th, 19th, 20th, and 21st indicate that the courses were, for the most part, southerly, still the schooner on the 21st of August is further to the north than the courses would seem to justify. The captain claimed that this might be due to drifting caused by the current, but it seems incredible that if the schooner had been following the courses claimed, and the latitude and longitude set out in her journal were correct, she should have been discovered by the Corwin within the prohibited area. And it must be remembered that, after the schooner was first sighted by the Corwin, she was standing southward, with all sail set, and had made about five miles before she was seized; showing that she must have been considerably inside the prohibited zone when she first became aware of the presence of the cutter, which, according to the captain's testimony, was about 4 o'clock, or fully a half an hour before the cutter caught sight of the schooner. It is not denied that the schooner was within the limit on August 15th, although the captain claims that he did not ascertain that he was within the prohibited area on that date, until the Corwin reported it, after arriving at Dutch Harbor. However that may be, the captain's own longitude and latitude for that day placed him, as we have seen, within the prohibited zone. In fact, it would seem that from the 14th to the morning of the 22d of August, the day of seizure, he was hovering around, and was at times very close to, the outside limit of the prohibited zone. The fact that he was in the vicinity of the limit should have been sufficient to put him on the alert, and made him particularly careful in his navigation. As a careful navigator, disposed not to transgress the law, he should have kept a full and accurate record of his positions and courses and distances, so that he might not cross into and hunt within the prohibited area, and

that, by his records and charts, he might be able, if called upon, to demonstrate clearly and satisfactorily that he was not within the prohibited area. Mr. E. McNevin was called on behalf of the claimants, and testified that he was a teacher of navigation in San Francisco; that he had taken the courses and distances given by Mr. De Otte as the courses and distances of the Corwin from Dalnoi point to her first noonday observation, and from her noonday observation to the alleged point of seizure, and had worked them up; that he had worked up these courses and distances both ways,— that is, by subtracting the percentage if the slip of the log were fast, and by adding if it were slow; that by subtracting 6 per cent. the latitude would be 55° 35' 25"; by adding six per cent. to the log-her position would be 55° 28' 31" N.; that this last calculation would place the schooner about five miles to the southward of the line of the prohibited area. The position of the schooner, according to the calculation of this witness, was marked "No. 10" on U. S. Exhibit 2. On cross-examination the witness testified that the position of the schooner at the time of the seizure, considering the 6 per cent. slip of the log subtractive, would be two miles within the prohibited area, and her latitude would be, as stated above, 55° 35' 25". The significance and importance of this statement in favor of the contention by counsel for the government that the schooner was within the prohibited area, and against that of the claimant that she was not, by one of their own witnesses, is that the officers of the Corwin testified positively, when recalled in rebuttal, that the log of the Corwin, used by them in determining the position of the schooner within the prohibited zone, registered a 6 per cent. slip subtractive. Their testimony on this point was not contradicted, and, in view of its importance, I will quote it at large:

"Q. by Mr. Knight: Mr. De Otte, do you know for how long the log of the Corwin has been in use? A. For several years. Q. How nearly correct does that log register? A. Six per cent. slip subtractive. Q. How do you know that? A. By comparing it with another log, and running distances along shore and around the Pribilov Islands. Q. Will you state whether or not you have made that allowance in the Corwin's record? A. Yes, sir."

On cross-examination he testified:

"Q. Mr. De Otte, is that log fast or slow? A. The log is fast. Q. You testified the other day that the log was slow. What has caused you to change your mind about that? A. I must have misunderstood your question, if I did say that. Q. I did not ask you. Mr. Knight asked you. A. I must have misunderstood the question. Q. Have you got any record in your log book of the slip of that log? A. Yes, sir. Q. Where is it? A. From day to day, where the officers have subtracted it, from the beginning of the log to the last. Q. That is the only record you have? A. No, sir; that is not the only record. Q. Where is the other? A. In the back of the log book, where I have compared it with other logs. Q. The records you have back here are of two different logs? A. Yes, sir. Q. One is plus six per cent., and the other minus six per cent.? A. No; this is adding to get a total amount. I will show you over here. This is the reading of the actual log; consequently, plus six per cent. This is the correct reading, minus six per cent. The actual reading of the log from noon until five o'clock is 37.4. Mr. Knight: Q. Of the 22d of August? A. Of the 21st of August. Take six per cent. off, and it leaves 35.2. Mr. Frank: Q. This record on the back of the book is not the record of two different logs? A. Yes, sir; there is the new log there. Q. I am not speaking of the registering, but I mean two different patent logs. A. Yes, sir; there is another log there.

You will see from the side columns of the log where the officers have subtracted six per cent. every hour.   Q. You say now you made a mistake the other day on your direct examination, when you said the log was six per cent. slow?   A. I must have misunder ,ood the question."

Mr. C. S. Craig, the second lieutenant of the Corwin, testified as follows:

"Q. by Mr. Knight: Do you know how the log of the Corwin registers, that was used in computing the position of the Corwin from Dalnoi point to the place of seizure, and thence on to Dutch Harbor, on the 21st and 22d days of August, 1896, up to the 24th of August?   A. I know that, the log that we used, we always subtracted six per cent.   Take off six per cent. from the reading, and it will give you the correct reading and distance.   Q. Do you know whether or not that has been the practice on board of her?   A. Ever since I joined her."

On cross-examination he testified:

"Q. Do you always use the same log?   A. Sometimes we use the other log, but only for a few hours at a time.   Q. All logs do not have the same slip, do they?   A. No, sir; but we use this old one as a standard, and tested it on our various runs."

Other features of the evidence, tending to show that the schooner was within the prohibited area, might be referred to, but I hardly deem it necessary.  Suffice it to say that it has been established to my mind, beyond a reasonable doubt, that the first two boats seized by the Corwin were within the prohibited area, and that the schooner herself was within the limit when she was seized, and had been for some time previous thereto.  How far inside the schooner and boats had been, and for precisely how long a period that day, cannot be determined from the evidence.  But I am of the opinion that they were considerably inside the prohibited zone; for, when the schooner was first descried by the officers of the Corwin, she was standing to the southward, with all sail set, and made about 5 miles before she was seized.  The place of seizure, as before stated, is fixed by the officers of the Corwin at from 1½ to 4½ miles from the limit, according to the different calculations employed to determine the position of the schooner and cutter.  So that, when first discovered, the Jane Gray was all the way from about 6½ to 9½ miles inside the limit.

The next question which arises is whether the master, officers, and crew of the Jane Gray used or employed her in killing fur seals within the prohibited zone.  Upon this question little need be said. That the schooner was then engaged in killing, and did kill, seals within the prohibited area, is hardly susceptible of a reasonable doubt.  In the captain's own statement, prepared by him on the evening of the seizure, appears the following admission that he was sealing on that day.  It reads:  "Then one of the cutter's boats came alongside, and asked me what I was doing here.  I told him that I was sealing."  One of the first small boats seized by the Corwin contained a dead seal.  Not the slightest explanation of this fact was offered by the captain; perhaps for the very good reasons that none could be made.  The boats were then returning from the day's hunt, having been away since 6 or 7 o'clock that morning, and to such a distance from the schooner that they were out of her sight.  Mr. Craig, the seizing officer, testified that there

were several bodies of dead seals on the deck of the schooner. How many, does not appear. He testified that: "They were lying on the main deck. They had taken them out of the boats. They were hoisting the sealing boats when I went alongside with our cutter boat." The official sealing log shows that 7 seals had been caught the day before, and 17 the day before that. I do not, however, base a condemnation for what occurred on either the 20th or the 21st of August. I am concerned alone, upon this second count, with what transpired on the 22d of August. The libel charges that 21 fur seals were killed on the 22d of August, 1896. The testimony of the officers does not show how many dead seals were found on the deck of the schooner when she was seized, or how many were killed by the other boats. The official sealing log shows, however, that 21 seals were killed on that day. But it can make no difference, so far as the law and a condemnation are concerned, whether 1 or 21 seals were killed within the prohibited area on that day by those connected with the schooner. Nor would it make any difference in law whether, at the time of the killing, the schooner were just outside the prohibited area, while her boats were inside. If the boats were alone inside, and killed seals therein, the schooner, her tackle, apparel, furniture, and cargo, are, in law, just as much subject to condemnation and forfeiture. Otherwise it would result that the statute would prove impractical in its operation, and the protection to fur seals a delusion. By far the greater part of seal hunting is done from the small boats. This was admitted by the captain of the schooner himself. I desire it to be distinctly understood that I do not base a judgment of condemnation in this case upon the presumption, contained in the second clause of section 10 of the act of April 6, 1894, supra, which provides that:

"If any licensed vessel shall be found in the waters to which this act applies, having on board apparatus or implements suitable for taking seals, but forbidden then and there to be used, it shall be presumed that the vessel in the one case and the apparatus or implements in the other was or were used in violation of this act until it is otherwise sufficiently proved."

As I do not find any evidence tending to show that the schooner Jane Gray had on board, when seized, any apparatus or implements forbidden to be used, which, by section 5 of the same act, are specified as "any net, firearm, airgun, or explosive," the presumption therein referred to would not be applicable. But I do find from the evidence—the proved facts in the case, and the inferences that naturally and logically flow therefrom—that the schooner Jane Gray and her boats were used and employed by the master, officers, and crew, on the 22d of August, 1896, in killing, and did kill, fur seals within the prohibited zone of 60 miles around the Pribilov Islands, and that, therefore, the schooner, her tackle, apparel, furniture, and cargo hereinbefore specified, are subject to the penalty denounced by section 8 of the act of April 16, 1894, for a violation of section 1 of the same act, as amended by the act of April 24, 1894. Let a judgment and decree of condemnation and forfeiture be entered in favor of the United States.