## MAUL *v.* UNITED STATES.[1]

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 655. Argued January 19, 20, 1927.—Decided May 31, 1927.

1. Officers of the Coast Guard are authorized, by virtue of Rev. Stats. § 3072, to seize on the high seas more than 12 miles from the coast an American vessel subject to forfeiture for violation of the revenue laws. Pp. 503, 512.

2. Section 3072 of the Revised Statutes, providing that "It shall be the duty of the several officers of the customs to seize and secure any vessel or merchandise which shall become liable to seizure by virtue of any law respecting the revenue, as well without as within their respective districts," was not affected by the first paragraph of § 581 of the Act of September 21, 1922, which provides primarily for boarding and searching vessels "at any place in the United States or within four leagues of the coast," to discover and prevent intended smuggling, and secondarily for prompt seizure of the vessel by the searching officer if the search disclose a violation of the law which subjects her to forfeiture. P. 505.

3. In construing altered revenue laws the whole system must be regarded in each alteration, and no disturbance allowed of existing legislative rules of general application beyond the clear intention of Congress. P. 508.

4. Sections 4337 and 4377 of the Revised Statutes, which subject to forfeiture any vessel, enrolled or licensed in the coastwise trade,

---

[1] "The Underwriter," 13 F. (2d) 433.

which shall proceed upon a foreign voyage without giving up her enrollment or license and without being duly registered, and any licensed vessel employed in trade other than that for which she was licensed, are directed to the protection of the revenue, (besides being regulations of commerce,) and therefore come within the term "law respecting the revenue" as used in § 3072, *supra*. P. 508.

5. Officers of the Coast Guard are "officers of the customs," having "districts" within the meaning of Rev. Stats. § 3072, and are authorized to make seizures thereunder. P. 509.

6. The provision of Rev. Stats. § 3072, for seizures by officers of the customs "as well without as within their respective districts," is to be construed as respects domestic vessels to include the sea outside of customs districts. P. 510.

7. Congress has power to authorize seizure of domestic vessels on the high sea for violation of the revenue laws. P. 511.

13 F. (2d) 433, affirmed.

CERTIORARI (273 U. S. 684) to a decree of the Circuit Court of Appeals reversing one by the District Court, 6 F. (2d) 937, which dismissed a libel for the forfeiture of a domestic vessel charged with violations of the revenue laws. The ground of the dismissal was that the seizure of the vessel more than twelve miles from the coast, and by officers of the Coast Guard, was unwarranted by law, and that the District Court was therefore without jurisdiction.

*Mr. Nathan April,* with whom *Messrs. Howard M. Long* and *Louis Halle* were on the brief, for petitioner.

*Assistant Attorney General Willebrandt,* with whom *Solicitor General Mitchell* and *Mr. A. W. Henderson,* Special Assistant to the Attorney General, were on the brief, for the United States.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This is a libel of information for the forfeiture of the *Underwriter,* an American vessel enrolled and licensed for the coastwise trade. Five causes of forfeiture are set

forth. One is that, in violation of § 4377 of the Revised Statutes, the vessel was employed in a trade other than that for which she was licensed. Another is that, in violation of § 4337 of the Revised Statutes, the vessel proceeded from the United States on a foreign voyage without giving up her enrolment and license and without being duly registered. The others are not now insisted on.

In December, 1924, officers of the Coast Guard seized the vessel on the high seas, thirty-four miles from the coast, and turned her over to the collector of customs at New London, Connecticut, whereupon the libel was filed and the vessel arrested.

The case was heard on an agreed statement of facts and an exception by the claimant, Maul, to the court's jurisdiction. The exception was sustained on the theory that the officers of the Coast Guard were without authority to seize the vessel at sea more than twelve miles from the coast, and a decree dismissing the libel was entered. 6 Fed. (2d) 937. The Circuit Court of Appeals held the exception untenable, sustained the two causes of forfeiture before stated, and accordingly reversed the decree. 13 Fed. (2d) 433. The claimant petitioned for a review by this Court on certiorari and the petition was granted.

The claimant does not question here that the agreed facts establish the two causes of forfeiture, but does insist that the seizure was made without authority, and particularly that officers of the Coast Guard were not authorized to make such a seizure on the high seas more than twelve miles from the coast. The question has several phases which will be considered.

It is well to bear in mind that the case neither involves the seizure of a foreign vessel nor an exercise of asserted authority to board and search a vessel, domestic or foreign, for the purpose of detecting and thwarting in-

tended smuggling. . The seizure was of an American vessel, then on the high seas and more than twelve miles from the coast, which had become " liable to seizure and forfeiture " by reason of definite and accomplished violations of the law under which she was enrolled and licensed.

Section 45 of the Judicial Code declares: " Proceedings on seizures made on the high seas, for forfeiture under any law of the United States, may be prosecuted in any district into which the property so seized is brought and proceedings instituted." This provision originated with the Judiciary Act of 1789, c. 20, § 9, 1 Stat. 73, has remained in force ever since, § 734 Rev. Stats., and plainly recognizes that seizures for forfeitures may be made on the high seas. See *The Merino*, 9 Wheat. 391, 401–402; *The Abby*, 1 Fed. Cas. p. 26. True, it does not indicate how or by whom the seizures may be effected; but. other provisions speak to the point. There is need to trace them from the beginning; and in doing so it should be in mind that officers of the Coast Guard are to be deemed customs officers, a matter which will be explained later on.

The Act of July 31, 1789, c. 5, 1 Stat. 29, regulating the collection of duties on the tonnage of vessels and on the importation of merchandise, contained several provisions declaring that vessels violating its provisions should be liable to seizure and forfeiture, and also a section (26) authorizing customs officers " to make seizure of and secure any ship or vessel, goods, or merchandise, which shall be . liable to seizure by virtue of this Act, as well without as within their respective districts." That Act was repealed by the Act of August 4, 1790, c. 35, 1 Stat. 145, which enlarged the prior regulations and contained a section (50) giving customs officers the same authority to make seizures that was given

before. Next came the Act of March 2, 1799, c. 22, 1 Stat. 627, which again enlarged the regulations and contained a section (70) respecting seizures which was like that in the prior acts. This last provision is now § 3072 of the Revised Statutes and reads as follows:

" It shall be the duty of the several officers of the customs to seize and secure any vessel or merchandise which shall become liable to seizure by virtue of any law respecting the revenue, as well without as within their respective districts."

Along with the provision thus carefully preserved, the several acts contained other provisions distinct from it which authorized customs officers to board and search vessels bound to the United States and to inspect their manifests, examine their cargoes, and prevent any unlading while they were coming in. A supplemental Act of July 18, 1866, c. 201, 14 Stat. 178, enlarged that provision by declaring that, if it appeared to the officer making the search that there had been a violation of the laws of the United States whereby the vessel or any merchandise thereon was liable to forfeiture, he should make seizure of the same. The provision so enlarged became § 3059 of the Revised Statutes. In the early acts the authority to board and search was limited, not only to vessels bound to the United States, but to such as were within the territorial waters of the United States or within four leagues (twelve miles) of the coast. But in the Act of 1866 and in § 3059 of the Revised Statutes the words expressing these restrictions were omitted. Possibly the omission was not significant, for the same restrictions were expressed in § 3067 of the Revised Statutes which related to the boarding and searching of vessels.

The Act of September 21, 1922, c. 356, 42 Stat. 858, 979, 989, repealed §§ 3059 and 3067 of the Revised Statutes and enacted a provision dealing with the same subject and reading as follows:

" SEC. 581. BOARDING VESSELS. Officers of the customs or of the Coast Guard, and agents or other persons authorized by the Secretary of the Treasury, or appointed for that purpose in writing by a collector may at any time go on board of any vessel or vehicle at any place in the United States or within four leagues of the coast of the United States, without as well as within their respective districts, to examine the manifest and to inspect, search, and examine the vessel or vehicle, and every part thereof, and any person, trunk, or package on board, and to this end to hail and stop such vessel or vehicle, if under way, and use all necessary force to compel compliance, and if it shall appear that any breach or violation of the laws of the United States has been committed, whereby or in consequence of which such vessel or vehicle, or the merchandise, or any part thereof, on board of or imported by such vessel or vehicle is liable to forfeiture, it shall be the duty of such officer to make seizure of the same, and to arrest, or, in case of escape or attempted escape, to pursue and arrest any person engaged in such breach or violation.

" Officers of the Department of Commerce and other persons authorized by such department may go on board of any vessel at any place in the United States or within four leagues of the coast of the United States and hail, stop, and board such vessels in the enforcement of the navigation laws and arrest or, in the case of escape or attempted escape, pursue and arrest any person engaged in the breach or violation of the navigation laws."

The last paragraph of this provision relates to the apprehension and arrest of individuals violating the navigation laws, not to the seizure of vessels and neither party bases any contention or argument on it. So it may be passed as without bearing here.

But the claimant contends and the District Court ruled that the first paragraph is now the sole source and meas-

ure of the authority of Coast Guard officers to seize vessels, and that, as it provides only for seizure within the United States or within twelve miles of the coast, a seizure outside these limits is unlawful. The contention is faulty in that it puts aside §.3072 of the Revised Statutes, before quoted, which authorizes customs officers to seize any vessel "liable to seizure by virtue of any law respecting the revenue" and declares, without limiting words, that this authority may be exercised "as well without as within their respective districts."

Without doubt the provision in the Act of 1922 is intended to take the place of §§ 3059 and 3067 of the Revised Statutes. It deals with the same subject and is accompanied by an express repeal of those sections. But it is not accompanied by a repeal of § 3072, and there is otherwise no reason for thinking it is intended to repeal or disturb that section. While the new provision and § 3072 are closely related and both are directed to the protection of the revenue, they are distinct, free from real repugnance, and well may stand together. One provides primarily for boarding and searching vessels, within prescribed limits, to discover and prevent intended smuggling, and secondarily for the prompt seizure of the vessel by the searching officer if the search discloses a violation of law which subjects her to forfeiture. The other provides broadly, and without restriction as to place, for the seizure of vessels which, through violation of the laws respecting revenue, have become liable to seizure. While the former restricts the authority to board and search to particular limits—the territorial waters and the high seas twelve miles outward from the coast—it does not purport to lay such a restriction on seizures. Where the seizure is incidental to a boarding and search under that provision the presence of the vessel within the prescribed limits operates to fix the place of seizure. Possibly the restriction may be said to affect such a seizure, but only

in a limited sense. In other seizures, of which there are many, the restriction has no bearing and no effect. So no reason appears for thinking Congress clearly intended to displace the general and long continued provision in § 3072. In this situation effect should be given to the familiar rule that in construing altered revenue laws " the whole system must be regarded in each alteration, and no disturbance allowed of existing legislative rules of general application beyond the clear intention of Congress." *Saxonville Mills* v. *Russell,* 116 U. S. 13, 21; *Wood* v. *United States,* 16 Pet. 342, 363; *United States* v. *Sixty-seven Packages of Dry Goods,* 17 How. 85, 93.

Thus far it has been assumed that the seizure came within the terms of § 3072; but questions are suggested in this connection which will be noticed.

One question is whether the vessel's liability to seizure was " by virtue of any law respecting the revenue." The liability arose from a violation of §§ 4337 and 4377 of the Revised Statutes—in that the vessel, being enrolled and licensed for the coastwise trade, proceeded on a foreign voyage without giving up her enrolment and license and without being duly registered,[2] and was employed in a trade other than that for which she was licensed. The sections violated are found in a subdivision of the Revised Statutes entitled " Regulation of Vessels in Domestic Commerce," but the arrangement of sections in the Revision is without special significance, Rev. Stats. § 5600. That subdivision includes several provisions designed to regulate commerce by vessels and also to protect the revenue, these being related subjects. A reading of the sections violated in connection with others in the same sub-

---

[2] The distinction between being enrolled and licensed and being registered is that the former is a condition to employment in the coastwise trade while the latter pertains to foreign trade.

division [3] makes it plain that they are directed to the protection of the revenue; and therefore they come within the terms of § 3072. That they are also regulations of commerce by vessels does not make them any the less laws respecting the revenue.

Another question is whether officers of the Coast Guard are among those whom the section authorizes to make seizures. It says "officers of the customs" and speaks of "their respective districts."

By the Act of 1790 (§§ 62–64) Congress established the Revenue Cutter Service for the express purpose of protecting the revenue, directed that its expenses be paid out of duties collected on imported merchandise and on the tonnage of vessels, and declared that its officers should "be deemed officers of the customs." By the Act of 1799 (§§ 97–102) these provisions were enlarged and reenacted, collectors of customs were given a power of direction over the service subject to assignments and wide supervision by the Secretary of the Treasury, and officers of the service were given authority to hail "vessels liable to seizure or examination" and to enforce submission. The enlarged provisions were included in the Revised Statutes (§§ 2747–2765) and are still in force, save that in 1915 the Coast Guard became the successor of the Revenue Cutter Service and took over its personnel, vessels, duties and powers, c. 20, 38 Stat. 800.

The regulations issued by the Secretary of the Treasury from time to time show that it early became the practice to assign vessels and officers in this service to particular customs districts and to subject their activities largely to the direction of the collectors of customs.[4]

[3] Rev. Stat. §§ 4320, 4321, 4324, 4336, 4371; Act of January 16, 1895, c. 24, § 3, 28 Stat. 624.

[4] Regulations, 1843, pp. IX, XV, XVI, XVII; Regulations, 1871, §§ 16, 17, 20, 21, 22, 101, 204, 257; Regulations, 1894, §§ 22, 101, 141, 476.

And it otherwise appears that this practice became so settled that the vessels and officers when assigned were regarded as "belonging" to the particular districts. *The Eliza,* 8 Fed. Cas. p. 455; *The Friendship,* 9 Fed. Cas. p. 822.

In recent years the number of vessels and the personnel have been enlarged and provision has been made for imposing additional duties not requiring special notice here. The practice of assigning vessels and their officers to particular customs districts also has been changed to the extent that now the assignments are of one or more vessels to coast divisions, including one or more customs districts.[5] Otherwise the duties and practice in respect of the protection of the revenue remain practically as before.[6]

It is apparent from this review of the statutes and regulations that Coast Guard officers are to be deemed officers of the customs within the meaning of § 3072, and also that their connection with particular customs districts—whether one or more—is such that they properly may be said to have districts in the sense intended by the term "their respective districts." The term is not peculiar to § 3072. It was applied to Revenue Cutter officers in § 31 of the Act of 1790, § 54 of the Act of 1799, and §§ 3059 and 3067 of the Revised Statutes, and is now applied to Coast Guard officers in § 581 of the Act of 1922.

The remaining question relates to the meaning of the clause indicating where the officers may seize. It says "as well without as within their respective districts." Two constructions are suggested—one restricting the natural sense and treating the clause as if saying "as well within other customs districts as within their own"; and the other accepting the natural sense. The difference

---

[5] Regulations, 1923, §§ 31, 41.

[6] Regulations, 1923, §§ 22, 812, 814, 2501, 2503.

is that one excludes and the other includes the sea outside customs districts. In actual practice the latter construction has been adopted and it appears to be right. Besides giving effect to the natural import of the clause, it is better adapted to the attainment of the purpose of the section. If vessels violating the revenue laws and thereby incurring liability to forfeiture could escape seizure by departing from or avoiding waters within customs d:-tricts the liability to forfeiture would be of little practical effect in checking violations; and it is most improbable that Congress intended to leave the avenues of escape thus unguarded. The terms it has used are easily broad enough to meet the situation effectively, *United States.* v. *Bowman,* 260 U. S. 94, 98–100, and no reason is suggested or perceived for cutting them down as respects domestic vessels. If Congress were without power to provide for the seizure of such vessels on the high sea, a restrictive construction might be justified. But there is no want of power in this regard. The high sea is common to all nations and foreign to none; and every nation having vessels there has power to regulate them and also to seize them for a violation of its laws. *The Apollon,* .9 Wheat. 362, 371; *Wilson* v. *McNamee,* 102 U. S. 572, 574; *Lord* v. *Steamship Co.* 102 U. S. 541, 544; *The Hamilton,* 207 U. S. 398, 403; *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347, 355; *Cunard S. S. Co.* v. *Mellon,* 262 U. S. 100, 123, 129; 3 Opinions A. G. 405; 1 Kent's Com. *26; Hall's International Law, 7th ed., § 77; 1 Hyde International Law, § 227.

Some distinctions have been recognized in respect of seizing domestic vessels when in foreign waters and of seizing foreign vessels on the high sea, *Cunard S. S. Co.* v. *Mellon, supra,* 123–124; *The Apollon, supra,* 370–371; *Church* v. *Hubbart,* 2 Cr. 187, 234–235; *The Marianna Flora,* 11 Wheat. 1, 42; *Manchester* v. *Massachusetts,* 139 U. S. 240, 258; 1 Hyde International Law, § 236; West-

lake Int. Law, p. 177; but the extent and application of these distinctions are not involved in this case.

It follows that the seizure in this instance by the officers of the Coast Guard was lawful and therefore that the exception to the District Court's jurisdiction was ill grounded. Whether if the seizure—made by federal officers—were unlawful the ruling in *Dodge* v. *United States,* 272 U. S. 530, would apply need not be considered.

The decree of the Circuit Court of Appeals is

*Affirmed.*

MR. JUSTICE BRANDEIS, concurring.

I concur in the judgment of the Court. But I cannot agree to the construction of the statutes on which the decision is rested. The Court holds that the statutes confer upon the Coast Guard express authority to seize on the high seas beyond the twelve-mile limit an American vessel which has become liable to forfeiture for violation of the navigation laws; and the reason assigned is that these are "laws respecting the revenue" within the meaning of § 3072 of the Revised Statutes. As I read the statutes, they do not confer express authority, but the authority exists because it is to be implied as an incident of the police duties of ocean patrol which Congress has imposed upon the Coast Guard. Mere difference of opinion in the construction of intricate statutes can rarely justify expression of dissent. This is especially true where the two views lead, in the particular case, to the same result. But, in this instance, the construction adopted by the Court may have in other cases far-reaching and regrettable results.

Enforcement of the "laws respecting the revenue" forms only a part of the ocean patrol duties imposed by Congress upon the Coast Guard. And seizure on the high seas of vessels which have "become liable to seizure" does not exhaust the services required of the Coast

Guard to ensure enforcement there of the laws respecting the revenue. Unless the Coast Guard has authority to seize the ship and to arrest persons thereon found violating our laws, no American official is authorized to do so. If the statutes are construed as granting to the Coast Guard express authority to make the seizure in question in order to protect the revenue, the authority so granted is obviously very narrow, and the express grant may possibly be read as exhausting the authority conferred beyond the twelve-mile limit; in other words, as showing that no implied authority is conferred. For this reason it seems to me important to state why I cannot assent to the view expressed by the Court.

The claimant concedes that, within the United States, the Coast Guard is charged with the duty of enforcing our navigation laws, and for this purpose, may board, search, and seize American vessels there; that our navigation laws govern American merchant vessels on the high seas; and that the United States could by appropriate legislation authorize the Coast Guard to seize, without a warrant, any such vessel violating our law on the high seas, regardless of distance from our coast. See *United States* v. *Bowman*, 260 U. S. 94, 97; *Cunard Steamship Co.* v. *Mellon*, 262 U. S. 100, 125, 129. His contention apparently is that Congress does not impose upon officers of the Coast Guard any duty to enforce the navigation laws on the high seas beyond the twelve-mile limit; and that, even if it does impose the duty, it has not conferred authority to enforce compliance by means of a seizure to be made there. The question for decision is the power of the Coast Guard to seize American vessels beyond the twelve-mile limit.[1]

---

[1] The power, in relation to American vessels, was upheld in *The Rosalie M.*, 4 F. (2d) 815, affirmed without passing upon the point in 12 F. (2d) 970. See *The Homestead*, 7 F. (2d) 413, 415. *Contra,*

The Coast Guard is a part of the civil establishment. It is a bureau of the Treasury Department,[2] established by Act of January 28, 1915, c. 20, 38 Stat. 800, in lieu of the existing Revenue Cutter Service and Life-Saving Service. These had theretofore been separate—the Revenue Cutter Service a division, the Life-Saving Service a bureau, of the Treasury. *Louisville & Nashville R. R. Co.* v. *United States,* 258 U. S. 374. The Revenue Cutter Service was established by Act of August 4, 1790, c. 35, §§ 31 and 62–65, 1 Stat. 145, 164, 175. That statute was superseded by the Act of March 2, 1799, c. 22, §§ 54, 70, 97–102, 1 Stat. 627, 668, 678, 699, 700. The provisions of the Act of 1799 concerning search and seizure specifically by revenue cutters were embodied without substantial change in the Revised Statutes, §§ 2760, 2761, 2763, 3067, 3069, 3070 and 3072. Their scope and purpose will be discussed later. They are now in full force, except so far as they were repealed by the Tariff Act of 1922 or may have been modified by § 581 thereof. The

---

*United States* v. *Bentley,* 12 F. (2d) 466; *Lee* v. *United States,* 14 F. (2d) 400, reversed by this Court, *United States* v. *Lee, post,* p. 559. For seizures of foreign vessels, beyond territorial waters, under the hour's run treaties, see *Ford* v. *United States,* 273 U. S. 593; *The Pictonian,* 3 F. (2d) 145; *The Over The Top,* 5 F. (2d) 838; *United States* v. *Henning,* 7 F. (2d) 488, reversed in 13 F. (2d) 74; *The Sagatind,* 11 F. (2d) 673; *Haughan* v. *United States,* 13 F. (2d) 75. For seizures of foreign vessels beyond the treaty limits, see *The Frances Louise,* 1 F. (2d) 1004; *The Panama,* 6 F. (2d) 326. For seizures of foreign vessels between the three and twelve mile limits, under the hovering statutes, before the treaties, see *United States* v. *Bengochea,* 279 Fed. 537; *The Grace and Ruby,* 283 Fed. 475; *United States* v. *1,250 Cases of Intoxicating Liquors,* 292 Fed. 486; *Arch* v. *United States,* 13 F. (2d) 382.

[2] The Act of 1915, § 1, like the earlier law, provides that the Coast Guard " shall operate as a part of the Navy, subject to the orders of the Secretary of the Navy, in time of war or when the President shall so direct."

Act of 1915 did not add to or abridge in any respect existing duties and powers of officers of revenue cutters. It merely transferred to the Coast Guard the duties and powers theretofore possessed.

When the Revenue Cutter Service was established, its duties were limited to the protection of the revenues. In 1793, the duty of enforcing also the navigation laws was imposed.[3] Thereafter, from time to time, the duty of enforcing many other laws relating to transactions involving marine operations was added. Revenue cutters became thus America's civil ocean patrol.[4] But their service is not limited to enforcing our municipal law. They have been employed also in protecting the lives and property of Americans against foreigners in international controversies falling short of war; and they have served during wars in operations against the enemy.[5] Revenue cutters are armed cruisers. Naval discipline, drill and routine prevail on all the ships. Their officers are commissioned, and their men enlisted, like officers and men in the Army, Navy and Marine Corps. The Secretary of the Treasury assigns them to a particular vessel; and the vessel is usually assigned to a particular station. But he may make such transfer of an officer from one vessel to another, and of the vessel from one station to another, as he deems desirable. Both the Secretary of the Treasury and the President may direct any

---

[3] Act of February 18, 1793, c. 8, § 27, 1 Stat. 305, 315.

[4] The Coast Guard regulations make it the duty of officers to enforce " all . . . maritime laws of the United States." Regulations, 1923, Art. 2501. The cutters are frequently called upon to furnish transportation and other assistance to other departments of the Government. Reports of Revenue Cutter Service and Coast Guard, 1872, p. 12; 1873, pp. 11–13; 1891, p. 4; 1914, p. 101; 1915, pp. 24, 130–140; 1916, p. 21.

[5] Revenue Cutter Service Report for 1891, p. 13; Report for 1897, p. 7; Coast Guard Report for 1920, p. 9.

revenue cutter to cruise in any waters in order to perform any duty of the service. *Wiley* v. *United States*, 40 Ct. Cl. 406; Act of April 21, 1910, c. 182, § 2, 36 Stat. 326; Regulations of Coast Guard (1923), Art. 101.

With the enlargement of the revenue cutters' functions came necessarily an extension of the field of their operations. They range the seas coastwise or far into the ocean, as occasion and the particular duties demand. The earlier regulations[6] issued by the Secretary of the Treasury, included among the laws to be enforced, those prohibiting the slave trade,[7] the laws to preserve neutrality,[8] laws for the suppression of piracy,[9] and the law to prevent the cutting and removing of timber from public lands "for exportation to any foreign country."[10] Among the duties recited in the later regulations[11] are lending medical aid to vessels of the United States engaged in deep sea fisheries;[12] enforcing the sponge fishing law;[13] assisting vessels in distress upon the oceans[14] and

---

[6] "Instructions to officers of the United States Revenue Cutter Service" issued by the Treasury Department October 3, 1834, p. 1; "Rules and Regulations for the Government of the United States Revenue Marine, issued November 1, 1843," p. ix.

[7] Act of March 22, 1794, c. 11, § 1, 1 Stat. 347; April 20, 1818, c. 91, §§ 2, 4, 3 Stat. 450, 451; see March 3, 1819, c. 101, § 1, 3 Stat. 532.

[8] Rev. Stat. §§ 5283–5287; Act of March 4, 1909, c. 321, 35 Stat. 1088, 1090; Act of June 15, 1917, c. 30, Title V, 40 Stat. 217, 221. See Revenue Cutter Service Report for 1897, pp. 21–22.

[9] Act of April 30, 1790, c. 9, § 8, 1 Stat. 112, 113; Act of March 3, 1819, c. 77, §§ 1, 4, 3 Stat. 510, 511, 513. See Act of May 15, 1820, c. 113, 3 Stat. 600.

[10] Act of March 1, 1817, c. 22, §§ 2, 3, 4, 3 Stat. 347.

[11] Regulations U. S. Coast Guard, 1923, c. 2.

[12] Act of June 24, 1914, c. 124, 38 Stat. 387.

[13] Act of June 20, 1906, c. 3442, 34 Stat. 313; Act of August 15, 1914, c. 253, 38 Stat. 692.

[14] Rev. Stat. § 1536; Act of April 19, 1906, c. 1640, §§ 1–3, 34 Stat. 123. Reports of Revenue Cutter Service, 1873, pp. 7–9; 1881, pp. 9, 15; 1891, pp. 14, 39.

the Great Lakes;[15] removing derelicts;[16] suppressing mutinies;[17] patrolling the North Pacific and the Bering Sea for the purpose of enforcing the laws for the protection of the fur seal and sea otter;[18] and the service of ice observation and patrol, pursuant to the Convention of January 20, 1914, designed to promote safety on the North Atlantic, following the International Conference of November 12, 1913.[19]  By no act or regulation is the field of activity restricted to the twelve-mile limit.  Some of the duties imposed upon revenue cutters involve necessarily service hundreds of miles from any American coast.[20]

---

[15] Rev. Stat. § 2759.

[16] Act of May 12, 1906, c. 2454, 34 Stat. 190.

[17] See e. g., Reports, 1881, pp. 14–23; 1915, p. 20.

[18] Concerning the service of revenue cutters in connection with the forfeiture of vessels killing otter, fur seals, etc., in the Alaskan waters and beyond, see the Acts of July 27, 1868, c. 273, §§ 6, 7, 15 Stat. 240, 241; March 2, 1889, c. 415, § 3, 25 Stat. 1009; July 1, 1870, c. 189, 16 Stat. 180; June 20, 1878, c. 359, 20 Stat. 206, 212; March 3, 1879, c. 182, 20 Stat. 377, 386; December 29, 1897, c. 3, § 8, 30 Stat. 226, 227; March 3, 1899, c. 429, §§ 173–183, 30 Stat. 1253, 1279–1281; June 14, 1906, c. 3299, § 4, 34 Stat. 263, 264; April 21, 1910, c. 183, 36 Stat. 326.  To give effect to the convention of July 7, 1911, between Russia, Japan, England, and the United States (37 Stat. 1542), Congress passed the Act of August 24, 1912, c. 373, 37 Stat. 499, which specifically provided (§ 9) for the search and seizure of American vessels on the high seas.  An earlier statute giving effect to a similar treaty between England and the United States carried the same provision.  Act of April 6, 1894, c. 57, §§ 11, 12, 28 Stat. 52, 55.  See also *In re Cooper,* 143 U. S. 472; *The James G. Swan,* 50 Fed. 108; *The La Ninfa,* 75 Fed. 513; *The Alexander,* 75 Fed. 519; *The James G. Swan,* 77 Fed. 473; *United States* v. *The Jane Gray,* 77 Fed. 908.  For some years a special fleet of revenue vessels has been assigned to the Bering sea patrol, sometimes in cooperation with the Navy and Department of Commerce.  See e. g., Report for 1920, pp. 22–31.

[19] See Report for 1914, p. 86.

[20] See Reports, 1891, pp. 3, 14; 1897, pp. 21–22; 1913, p. 42; 1914, pp. 35, 85, 126, 149–151, 158–161; 1915, pp. 7, 11, 14, 16–18, 24,

Forfeiture of the offending vessel is a punishment commonly prescribed for violation of our navigation laws, and of many other laws which revenue cutters are required to aid in enforcing. Of these there are many which are in no way concerned with the collection of the revenue.[21] In order to enforce these laws adequately, it is necessary that some officials of the Government shall

---

130–140; 1916, pp. 11–13, 21, 105; 1917, pp. 13–14, 19–20, 102, 118; 926, p. 22.

[21] Aside from the customs and registry and enrollment acts, referred to at length in the text, there have been many statutes providing for the seizure and forfeiture of vessels, or for a penalty which is made a lien upon the vessel. Some of these statutes confer power of seizure upon the revenue cutters, either specifically or by reference to officers of the customs or officers of the revenue; some provide for seizure by some other means, usually by the navy under the direction of the President; the majority make no specific provision for seizure.

(1) Power to seize or enforce conferred specifically upon revenue cutters. *Embargo and non-intercourse acts:* Joint Resolution of March 26, 1794, 1 Stat. 400; Act of May 22, 1794, c. 33, 1 Stat. 369; Act of April 18, 1806, c. 29, 2 Stat. 379; Act of December 22, 1807, c. 5, 2 Stat. 451 (supplemented by the Act of April 25, 1808, c. 66, § 7, 2 Stat. 499); Act of March 1, 1809, c. 24, 2 Stat. 528; Act of April 4, 1812, c. 49, 2 Stat. 700; Act of December 17, 1813, c. 1, 3 Stat. 88. *Slave trade:* Act of February 28, 1803, c. 10, 2 Stat. 205 (prohibiting importation into states forbidding admission); Act of March 2, 1807, c. 22, 2 Stat. 426 (not providing for the use of the cutters, but recognizing that use by giving the seizing crew part of the proceeds, whether the seizure " be made by an armed vessel of the United States, or revenue cutters thereof "); Act of March 3, 1819, c. 101, 3 Stat. 532 (same provision). *Miscellaneous:* Act of June 25, 1798, c. 58, 1 Stat. 570 (failure to report aliens on board); Act of July 13, 1861, c. 3, § 7, 12 Stat. 255 (closing confederate ports and forfeiting vessels of confederate citizens); Act of August 15, 1914, c. 253, 38 Stat. 692 (regulating sponge fishing in Gulf of Mexico); Act of August 31, 1852, c. 113, § 5, 10 Stat. 121, 140 (illegal carriage of mail); Act of June 8, 1872, c. 335, §§ 235–237, 17 Stat. 283, 312 (same); Act of March 6, 1896, c. 49, 29 Stat. 54 (anchorage in St. Mary's River); Act of May 27, 1796, c. 31, 1 Stat. 474 (state quarantine laws); Act of July 13, 1832, c. 204, 4 Stat. 577 (same); Joint

have authority to seize American vessels which are found violating them.   Many of the offenses are of such a character that they can be committed anywhere on the high seas.   The challenge of the authority of the Coast Guard

Resolution of May 26, 1866, 14 Stat. 357 (same); Act of June 7, 1924, c. 316, § 7, 43 Stat. 604, 605 (Oil Pollution Act).

(2) Power to seize or enforce conferred upon some other arm of the government (not necessarily excluding a similar power in the revenue cutters). *Embargo and non-intercourse acts:* Act of February 9, 1799, c. 2, 1 Stat. 613; Act of February 27, 1800, c. 10, 2 Stat. 7; Act of January 9, 1809, c. 5, 2 Stat. 506. *Neutrality laws:* Act of June 5, 1794, c. 50, 1 Stat. 381; Act of April 20, 1818, c. 88, 3 Stat. 447; Act of March 10, 1838, c. 31, 5 Stat. 212; Act of June 15, 1917, c. 30, Title V, 40 Stat. 217, 221. *Piracy laws:* Act of March 3, 1819, c. 77, 3 Stat. 510; Act of August 5, 1861, c. 48, 12 Stat. 314. *Miscellaneous:* Act of May 10, 1800, c. 51, 2 Stat. 70 (slave trade); Act of February 4, 1815, c. 31, 3 Stat. 195 (trading with the enemy); Act of August 2, 1813, c. 57, 3 Stat. 84 (seizure of American vessel using English pass, on high seas); Act of February 19, 1862, c. 27, 12 Stat. 340 (coolie trade); Act of September 8, 1916, c. 463, § 806, 39 Stat. 756, 799 (vessel departing without clearance); Act of June 15, 1917, c. 30, Title II, 40 Stat. 217, 220 (regulations governing vessels in territorial waters in time of emergency).

(3) No express provision for seizure or enforcement. *Navigation regulations:* Act of March 1, 1817, c. 31, 3 Stat. 351 (foreign vessels in coasting trade); Act of March 3, 1817, c. 39, 3 Stat. 361 (same); Act of March 2, 1819, c. 46, 3 Stat. 488 (excess of passengers); Act of February 22, 1847, c. 16, § 2, 9 Stat. 127, 128 (same); Act of March 3, 1855, c. 213, 10 Stat. 715 (same); Act of July 4, 1864, c. 249, § 7, 13 Stat. 390, 391 (false passenger list); Act of July 7, 1838, c. 191, 5 Stat. 304 (inspection and license for steam vessels); Act of May 5, 1864, c. 78, § 2, 13 Stat. 63, 64 (deception as to name of vessel); Act of February 28, 1871, c. 100, §§ 1, 45, 16 Stat. 440, 453 (same); Act of March 3, 1805, c. 42, § 3, 2 Stat. 342, 343 (armed vessel departing without clearance); Act of June 7, 1897, c. 4, § 4, 30 Stat. 96, 103 (rules of navigation); Act of June 9, 1910, c. 268, § 7, 36 Stat. 462, 463 (motorboat regulations); Act of May 28, 1906, c. 2566, § 1, 34 Stat. 204 (foreign-built dredge not documented). *Embargo and non-intercourse acts:* Act of June 13, 1798, c. 53, 1 Stat. 565; Act of February 28, 1806, c. 9, 2 Stat. 351; Act of April

to make a seizure beyond the twelve-mile limit presents, therefore, questions affecting the enforcement not only of the navigation laws, but also of the customs laws, the National Prohibition Law, and others. If the officers of revenue cutters were without authority to seize American merchant vessels found violating our laws on the high seas beyond the twelve-mile limit, or to seize such vessels found there which are known theretofore to have violated our laws without or within those limits, many offenses against our laws might, to that extent, be committed with impunity. For clearly no other arm of the Government possesses such authority.

The questions presented necessitate enquiry into early and recent administrative practice, as well as into legislation and judicial decisions. I shall consider first whether officers of revenue cutters had authority to seize on the high seas for violation of the navigation laws prior to

18, 1818, c. 70, 3 Stat. 432; Act of May 15, 1820, c. 122, 3 Stat. 602; Act of March 1, 1823, c. 22, 3 Stat. 740. *Trading with the enemy:* Act of July 6, 1812, c. 129, 2 Stat. 778. *Quarantine laws:* Act of August 30, 1890, c. 839, § 6, 26 Stat. 414, 416; Act of February 15, 1893, c. 114, 27 Stat. 449. *Opium laws:* Act of February 23, 1887, c. 210, 24 Stat. 409; Act of February 9, 1909, c. 100, 35 Stat. 614; Act of January 17, 1914, c. 9, 38 Stat. 275. *Miscellaneous:* Act of April 30, 1790, c. 9, § 8, 1 Stat. 112, 113 (piracy); Act of March 22, 1794, c. 11, 1 Stat. 347 (slave trade); Act of March 1, 1817, c. 22, 3 Stat. 347 (transportation of timber cut from navy lands); Act of March 2, 1831, c. 66, 4 Stat. 472 (same); Act of March 3, 1825, c. 107, 4 Stat. 132 (taking wrecks on Florida coast to foreign port); Act of May 6, 1882, c. 126, § 10, 22 Stat. 58, 61, amended by the Act of July 5, 1884, c. 220, § 10, 23 Stat. 115, 117 (Chinese exclusion); Act of July 2, 1890, c. 647, § 6, 26 Stat. 209, 210 (property transported in restraint of trade); Act of August 13, 1912, c. 287, §§ 1, 9, 37 Stat. 302, 308 (use of radio apparatus on vessel on high seas). See also the enumeration of certain offenses under the criminal code which usually take place on the high seas, in *United States* v. *Bowman,* 260 U. S. 94, 98–100.

the Tariff Act of 1922; then, whether that Act abridged their authority.

*First.* The provisions of the navigation laws alleged to have been violated, have been in force since the beginning of our Government. Act of February 18, 1793, c. 8, §§ 8, 32, 1 Stat. 305, 308, 316; Rev. Stat. §§ 4337, 4377. The express authority to board and search in terms beyond the territorial limits of the United States appeared first in §§ 31 and 64 of the customs-collection Act of August 4, 1790, c. 35, 1 Stat. 145, 164, 175, which established the Revenue Cutter Service. The authority there conferred upon it was to board and search within " the United States or within four leagues [twelve miles] of the coast." It applied to all vessels—foreign as well as American; but was limited to inbound vessels. These sections, which granted power to board and search, contained no express grant of power to seize. Express statutory authority to seize in terms beyond the territorial limits of the United States for violation of its laws was not conferred, until the Tariff Act of 1922, in respect to any offence except in those few instances in which Congress, in pursuance of specific treaties, provided that any vessel, foreign or American, might be seized.[22] We are concerned here only with the right of the Coast Guard to seize an American vessel for violation of a law applicable solely to such vessels.

The only express statutory authorization upon which, prior to the Tariff Act of 1922, a claim of power in any official to seize a vessel on any waters for violation of the navigation laws could possibly be predicated were § 27 of the Act of February 18, 1793, c. 8, 1 Stat. 305, 315 (a navigation law), which was repealed by its omission from

---

[22] See, for example, the treaties mentioned in note 18, *supra,* and statutes giving effect thereto.

the Revised Statutes;[23] and § 2 of the Act of July 18, 1866, c. 201, 14 Stat. 178 (a customs-collection law), which was embodied in § 3059 of the Revised Statutes as a part of " Title XXXIV, Collection of Duties upon Imports; " and § 3072 of the Revised Statutes, which dealt with seizures for violation of " any law respecting the revenue."[24]  Section 3059 authorized " any officer of the customs, including " those " of a revenue cutter," to " go on board of any vessel . . . to inspect, search and examine the same . . .; and if it shall appear that any breach or violation of the laws of the United States has been committed, whereby  . . .  such vessel . . .  is liable to forfeiture, to make seizure of the same  . . ."

The authority which § 3059, § 3072, and the earlier acts, expressly conferred upon all officers " of the customs " was to seize " as well without as within his district."  No distinction was there made between foreign and domestic vessels; nor between inbound and outbound vessels.  The clause appeared first in the Act of July 31, 1789, c. 5, § 26, 1 Stat. 29, 43, the earliest law regulating the collection of customs.  As there used, the clause clearly meant only that collectors, naval officers and surveyors should have the authority to seize in other districts of the United States besides the particular ones to which

---

[23] Section 27 was never expressly repealed.  In the " Revision of United States Statutes as Drafted by the Commissioners " (1872), it appeared as § 620 of Title 36, c. 10.  It does not appear in the Revised Statutes as finally enacted, however, and hence, under § 5596, must be deemed to have been repealed, because of the omission, since many other sections of the Act of February 18, 1793, were included therein.  It is in phraseology and substance similar to § 2 of the Act of July 18, 1866, c. 201, 14 Stat. 178.

[24] That section also is a re-enactment of identical provisions in earlier customs collection laws.  See Acts of March 2, 1799, c. 22, § 70, 1 Stat. 627, 678; August 4, 1790, c. 35, § 50, 1 Stat. 145, 170; July 31, 1789, c. 5, § 26, 1 Stat. 29, 43.

they were respectively appointed. For the clause ante-dated the first express authorization of either search or seizure without the territorial limits of the United States; and antedated also the establishment of the Revenue Cutter Service.[25] Did the phrase "without . . . his district," when used in § 3059, continue to mean within some other customs collection district of the United States; or did it acquire the new meaning of anywhere, even without the territorial waters of the United States? Compare *Taylor* v. *United States,* 3 How. 197, 205.

If the former meaning is the true one, there was prior to the Tariff Act of 1922 no express authority in officers of revenue cutters to seize for violation of any law beyond the territorial limits of the United States. If the latter meaning is the true one, not only officers of revenue cutters, but also all other customs officers were given by § 3059 express authority to seize anywhere on the high seas any vessel, foreign or American, found violating our laws. In my opinion the former meaning is clearly the true one. Congress cannot have intended to confer the general authority to seize foreign vessels upon the high seas.[26] And the clause in question is used in § 581 of the Act of 1922 in the same sentence with an express territorial limitation. But it does not follow that American vessels violating our laws beyond the territorial limits could not be seized. Authority to seize American vessels

[25] See also Alexander Hamilton's Report of February 2, 1795, American State Papers, Finance, Vol. I, No. 77, pp. 348, 349, urging the insertion of a similar clause in the statutes dealing with the power of internal revenue officers, who, of course, operate on land only.

[26] It has been commonly asserted that, even under the hovering laws, a sovereign may not seize a foreign vessel until it enters the territorial waters. These do not extend beyond the three-mile limit. John Bassett Moore, 1 Digest International Law, 726; L. H. Woolsey, Foreign Relations of the United States (1912), p. 1289; Charles Cheney Hyde, Int. Law, pp. 417–420. But see last group of cases cited in note 1, *supra.*

there was conferred upon officers of revenue cutters by implication. They possessed the authority as an incident of their office of ocean patrol. They are officers of the branch of the Government charged with the faithful execution of the laws. Wherever on the high seas they were charged with enforcing compliance with our laws, there they were, in my opinion, authorized to seize American vessels, regardless of the distance from our coast.[27] Compare *United States* v. *Macdaniel*, 7 Pet. 1, 15; *United States* v. *Tingey*, 5 Pet. 115, 126; 28 Op. Atty. Gen. 121, 124, 549, 552.

There is no limitation upon the right of the sovereign to seize without a warrant vessels registered under its laws, similar to that imposed by the common law and the Constitution upon the arrest of persons and upon the seizure of " papers and effects." [28]    See *Carroll* v. *United*

---

[27] The power of the ordinary peace officers to arrest and to seize does not seem to have been conferred originally by statute. As to the sheriff, statutes dealt with the method of appointment, tenure of office, and qualifications, but not with the extent of his powers. See 1 Blackstone Comm., 339–346; Dalton, Sheriff, *passim.;* Watson, Sheriff, c. I, c. III. Similarly as to constables and watchmen. See 4 Blackstone Comm., 292. These powers, including of course the power to arrest, are in this country thought to inhere in these offices, except in so far as they may be limited by statute. See *South* v. *Maryland*, 18 How. 396, 401–2; *Mayor of Baltimore* v. *State*, 15 Md. 376, 393 (constables and justices of the peace); *Kirksey* v. *Bates*, 7 Port. (Ala.) 529, 532 (notaries); *Doering* v. *State*, 49 Ind. 56, 61 (policeman); *Hawley* v. *Butler*, 54 Barb. (N. Y.) 490, 494–495 (marshals); *State* v. *Reichman*, 135 Tenn. 653, 661–662, 667 (sheriff). See Mechem, Public Officers, § 502. Compare *Allor* v. *Board of Auditors*, 43 Mich. 76 (constables); *People* v. *Keeler*, 29 Hun. (N. Y.) 175, 178; *State* v. *Brunst*, 26 Wis. 412; *State* v. *Dews*, R. M. Charlt. (Ga.) 397, 439; *State* v. *De Lorenzo*, 81 N. J. L. 613, overruling *Virtue* v. *Freeholders*, 38 Vroom, 139; *Commonwealth* v. *O'Cull*, 7 J. J. Marsh (Ky.) 149, 150; *Turner* v. *Holtzman*, 54 Md. 148, 159–160; *Quinn* v. *Heisel*, 40 Mich. 576.

[28] See also *Boyd* v. *United States*, 116 U. S. 616, 622–624. The right of the sovereign to seize a vessel for violation of the municipal

*States,* 267 U. S. 132, 151–153. Smuggling is commonly attended by violation of the navigation laws. From the beginning of our Government officers of revenue cutters have, for the purpose of enforcing the customs laws, been expressly authorized to board and search inbound vessels on the high seas within twelve miles of our coast. It is not to be lightly assumed that Congress intended to deny to revenue cutters so engaged authority to seize American vessels found to be violating our navigation laws. Nor is it lightly to be assumed that Congress intended to deny to officers of revenue cutters engaged in enforcing other laws of the United States beyond the twelve-mile limit, the authority to seize American vessels found to be violating our navigation laws beyond those limits.

From the beginning of our government, it has been the practice of revenue cutters to make such seizures. The official records and judicial decisions show that revenue cutters were employed early in our history, and that they have been employed continuously since, in enforcing our navigation laws upon the high seas regardless of distance from the coast; and that, whether operating within the United States or without, they have, regardless of distance from the coast, seized American vessels found violating our laws, without regard to whether the laws violated related to the revenue.[29] Congress has by its ac-

---

law, is in some respects analogous to the right of a belligerent, recognized by the international law, to seize contraband. See 2 Moore, Digest International Law, § 309; *The Marianna Flora,* 11 Wheat. 1, 42; *United States* v. *La Jeune Eugenie,* 26 Fed. Cas. No. 15,551.

[29] In most cases, the cutters merely report violations of law, without making seizures. The reports do show, however, that when it was thought necessary to arrest American vessels, the seizures were made without regard to location. See *The Elizabeth,* 8 Fed. Cas. No. 4, 352 (1810); *The Eliza,* 8 Fed. Cas. No. 4, 346 (1813); *United States* v. *The Little Ann,* 26 Fed. Cas. No. 15,611 (1809), reversed in 15 Fed. Cas. No. 8, 397; *The Brig Ann,* 9 Cranch, 289 (1815);

tion sanctioned this exertion of power. It supported the
activities of the service by ever increasing appropria-
tions.[30] It equipped the Coast Guard, before the Tariff
Act of 1922, with able cruising cutters, many of which
were engaged largely in patrol beyond the twelve-mile
limit. To seize anywhere on the high seas American ves-

---

*Burke* v. *Trevitt*, 4 Fed. Cas. No. 2, 163 (1816). Compare 3 Op.
Atty. Gen. 405. See also "Instructions to Officers in the United
States Revenue Cutter Service," October 3, 1834, p. 9; "Rules and
Regulations for the Government of the Revenue Marine," November
1, 1843, p. xv. Thus, in regard to specific American vessels, the
Commandant's office frequently sends out confidential orders to "seize
whenever and wherever found", or to "board and search whenever
and wherever found."

The files of the Coast Guard show that from September 1, 1922, to
February 10, 1927, at least seventy-five American vessels were seized
beyond the twelve-mile limit, for violations of the Prohibition Act
alone; of these seizures at least twenty-one were made more than
thirty miles from the coast.

[30] After the adoption of the Eighteenth Amendment Congress made
each year a large increase in the appropriation for the Coast Guard;
and provided for the acquisition of additional vessels of the cruiser
type. Before the passage of the Tariff Act of 1922 the year's appro-
priations had been increased to $9,800,000 and the acquisition or con-
struction of additional cruising vessels had been authorized. On
April 2, 1924, a special appropriation of $12,194,900 was made for
construction of additional ocean-going vessels and for reconditioning
and equipping those vessels which it authorized the Navy to transfer
to the Coast Guard. The appropriation for maintenance increased
to $20,800,000 by 1926.

In 1919, the aggregate of vessels boarded was 2,005; in 1922,
31,653; in 1925, 53,080. The number of vessels seized or reported for
violations of law increased from 601 in 1919 to 1,887 in 1925. It
should be noted that comparatively few of the penalties for minor
infractions of the law are collected. By the Act of February 14,
1903, c. 552, § 10, 32 Stat. 825, 829, the power to remit penalties and
forfeitures for violation of laws "relating to merchant vessels",
theretofore in the hands of the Secretary of the Treasury, was given
to the Secretary of Commerce. This power has been liberally exer-
cised. See e. g., 1913 Annual Report of Commissioner of Navigation,
p. 23.

sels found violating our laws was thus, I think, within the implied authority of its officers before the Act of 1922. It remains to consider whether that Act abridged the authority theretofore possessed.

*Second:* The Tariff Act of 1922 includes as Title IV a revision of the customs administrative provisions then in force. 42 Stat. 858, 948, *et seq.* In § 642 it recites the provisions of the earlier law which the Act repealed. Among these are §§ 3059 and 3067 of the Revised Statutes. The former is the section which conferred upon officers of the customs express power to seize " within or without his district." The latter is the section which conferred upon them authority to board and search inbound vessels within twelve miles of our coast. The sections parallel to § 3067, relating specifically to officers of revenue cutters, first found in § 64 of the Act of 1790, re-enacted as § 99 of the Act of 1799, and again as §§ 2760, 2761, 2762 of the Revised Statutes, were neither repeated nor repealed by the Act of 1922. Nor did it repeat or repeal § 3072. For the provisions repealed it substituted § 581, which, so far as material, is as follows: [31]

---

[31] The second paragraph of § 581, 42 Stat. 979, relates solely to officers of vessels of the Department of Commerce. It is as follows:

" Officers of the Department of Commerce and other persons authorized by such department may go on board of any vessel at any place in the United States or within four leagues of the 'coast of the United States and hail, stop, and board such vessels in the enforcement of the navigation laws and arrest or, in case of escape or attempted escape, pursue and arrest any person engaged in the breach or violation of the navigation laws."

Prior to 1903, the Secretary of the Treasury was charged with both the administration and the enforcement of the navigation laws. The administration was committed in part to the collectors of the ports, in part to the Bureau of Navigation. The enforcement was committed in part to the collectors, in part to the Revenue Cutter Service. In that year Congress created the Department of Commerce and Labor and transferred to it the Bureau of Navigation. Act of February 14, 1903, c. 552, 32 Stat. 825. In 1913 that bureau became a

"*Boarding Vessels.*—Officers of the customs or of the Coast Guard, and agents or other persons authorized by the Secretary of the Treasury, or appointed for that purpose in writing by a collector may at any time go on board of any vessel or vehicle at any place in the United States or within four leagues of the coast of the United States, without as well as within their respective districts, to examine the manifest and to inspect, search, and examine the vessel or vehicle, and every part thereof, and any person, trunk, or package on board, and to this end to hail and stop such vessel or vehicle, if under way, and use all necessary force to compel compliance, and if it shall appear that any breach or violation of the laws of the United States has been committed, whereby or in consequence of which such vessel or vehicle, or the merchandise, or any part thereof, on board of or imported by such vessel or vehicle is liable to forfeiture, it shall be the duty of such officer to make seizure of the same, and to arrest, or, in case of escape or attempted escape, to pursue and arrest any person engaged in such breach or violation."

The provision quoted above was adopted by Congress without substantial change from the draft of a bill contained in the report " Upon the Revision of the Customs Administrative Laws " made by the United States Tariff Commission to the Committee on Ways and Means in 1918, and re-submitted in 1921. Whether intentionally or not, the paragraph of § 581 quoted above introduced

part of the new Department of Commerce. Act of March 4, 1913, c. 141, 37 Stat. 736. Thereby certain duties in respect to the administration of the navigation laws passed to the Department of Commerce. To enable it to take some part also in the enforcement of the navigation laws Congress provided it with a few cutters. See Annual Report of Commissioner of Navigation, 1915, pp. 31–32. The above paragraph was inserted at the instance of the Department of Commerce when the Customs Administration law was in the conference committee.

two changes into the statutory law. Unlike the earlier statutes, it did not limit to inbound vessels the right to board and search. And, unlike the earlier statutes, it apparently conferred (through the inclusion of the grant of authority to seize in the same paragraph with the grant of authority to board or search) upon all customs officers the right to seize any vessel on any waters within the twelve-mile limit.[32] The reports of the Commission and those of the Committees of Congress discuss many proposed changes in the customs administrative laws. But nowhere in the reports of the Commission or of Congress, or in the statute enacted, is there a suggestion of purpose to abridge by this provision the authority theretofore possessed by the Coast Guard to make seizure on the high seas. It seems clear that Congress did not by this revision intend that the power to seize on the high seas for violation of laws respecting the revenue should remain, but that the similar power to seize for violation of other laws should be taken away.

Since, in my opinion, R. S. § 3059 had not conferred any express power to seize beyond territorial waters, I do not think its repeal shows any intention to take away the then existing implied power of the Coast Guard to seize American vessels anywhere on the high seas, for violation of any law of the United States. There is no foundation for the assumption of the claimant that the first paragraph of § 581 was intended as the exclusive grant of the power to seize. The primary purpose of that paragraph was not to provide for the seizure of American vessels of known or suspected guilt. It was to facilitate, by means of boarding and examination of manifest before arrival in port, both the entry of admittedly innocent vessels and the collection of revenues. This end was furthered by enabling customs officers to board and search any vessel, foreign or domestic, within

---

[32] See note 26, *supra.*

the stated limits, without the necessity of establishing probable cause.   The authority to board and search foreign vessels beyond the territorial limits would doubtless not have been implied as a mere incident of the customs officers' duties, and it is probable that the authority to board and search American vessels in the absence of probable cause was not regarded as clear.

Other action of Congress taken at about the same time shows that Congress had no purpose to abridge the Coast Guard's activities or powers.   The appropriation acts make provision for large increases in equipment and personnel to enable it to combat the increased smuggling operations following upon the enactment of the National Prohibition Law.   Moreover, conventions were negotiated with Great Britain and other foreign nations to secure permission to seize their vessels on the high seas if found engaged in smuggling operations.[33]   Neither in the negotiations nor in the conventions was any reference made to a twelve-mile limit. The limitation agreed upon was an hour's run from our coast.   The distance covered by the hour's run would often greatly exceed twelve miles from our coast.   But Congress did not deem it necessary to enact supplementary legislation in order to make the conventions effective.[34]

---

[33] At least nine such treaties have been proclaimed.   England, January 23, 1924, 43 Stat. 1761; Norway, May 24, 1924, 43 Stat. 1772; Denmark, May 29, 1924, 43 Stat. 1809; Germany, May 19, 1924, 43 Stat. 1815; Sweden, May 22, 1924, 43 Stat. 1830; Italy, June 3, 1924, 43 Stat. 1844; Panama, June 6, 1924, 43 Stat. 1875; Netherlands, August 21, 1924; Cuba, March 11, 1926.

[34] On March 3, 1924, the Secretary of State (Mr. Hughes) addressed a communication to the House Committee on Foreign Affairs in which it was said: " The proposed treaty is, in a strict sense, self-executing, requiring no legislation on the part of Congress to make it effective." Hearings before House Committee on Foreign Affairs on H. Res. 174, 68th Cong., 1st Session, p. 7.

In my opinion, then, the Coast Guard is authorized to arrest American vessels subject to forfeiture under our law, no matter what the place of seizure and no matter what the law violated.

Mr. Justice Holmes joins in this opinion.