## THE MISS C. B.

### UNITED STATES v. 1,997 SACKS OF ASSORTED LIQUORS AND 1,250 GALLONS OF ALCOHOL.

District Court, S. D. Alabama.

June 24, 1932.

Alex C. Birch, U. S. Dist. Atty., and J. E. Meredith, Asst. U. S. Atty., both of Mobile, Ala., for the United States.

Walter J. Gex, of Bay St. Louis, Miss., and Mahorner & Mahorner, of Mobile, Ala., for claimant.

ERVIN, District Judge.

The United States filed their libel against the British auxiliary schooner Miss C. B., and also a libel against her cargo of 1,997 sacks of assorted liquors and 1,250 gallons of alcohol. The libel against the ship alleged violation of sections 584 and 585 of the Tariff Act of 1930 (19 USCA §§ 1584, 1585). The libel against the cargo alleged violations of section 584 of the Tariff Act. One Theo Macridis appeared and filed a claim to the vessel and cargo as master of the vessel, and an answer denying the allegations of the libel. By agreement of proctors the two cases were heard together; the same facts being applicable to each case.

The evidence was heard in open court and shows substantially as follows:

The Coast Guard boat Mahoning left the Horn Island Whistling Buoy, off Pascagoula, at about 1:45 p. m., on March 11, 1932. She was steering a course of south magnetic and making a speed of about nine miles per hour. Her commanding officer testified that he had been instructed to search for the vessel Miss C. B. supposed to be in the vicinity of South Pass. The vessel changed her course at 8:05 p. m. and headed 232 degrees magnetic, but allowed 2½ degrees to the southward for leeway, there being a heavy breeze and rough sea with a current setting to the south. At 9:25 p. m. the lights of two vessels were sighted about two miles ahead. One of these vessels steered toward the shore and disappeared. The other, the Miss C. B., changed her course to southward, proceeding under power and sail. The Mahoning pursued the Miss C. B. and fired a flare, and, approaching her, directed her to proceed on a course of south-southwest. The vessel paying no attention to the orders, three blank shots were fired, and finally, after proceeding about 5½ miles, the Miss C. B. lay to. The weather being too rough to board, the Mahoning lay by the Miss C. B. until morning, and the weather continuing rough, she was taken in tow to Port Eads in the South Pass of the Mississippi river, for boarding purposes only. There a search was made, and she was found to be laden with a cargo of liquor. A demand was made of the master for the manifest, and he produced a paper showing a list of liquor stores, entitled "content," with the customs seal of Belize affixed. This paper was not sworn to, nor signed by the master, and was not in a form prescribed by the Secretary of the Treasury.

The vessel was then brought to the Port of Mobile, within this district, and turned over to the Collector of Customs. She was found to have on board 1,997 sacks of assorted liquors, and 1,250 gallons of alcohol of the appraised foreign value of, to wit, $15,342, and no other cargo.

Upon searching the vessel, a book containing navigation calculations was found, which was identified as the property and the work of one Luis Guillen, a member of the crew. The master of the vessel at the trial testified this man was learning navigation and he was instructing him. The book was found in the master's cabin, though Guillen bunked in the forecastle.

Lieutenant Whitfield testified that he had worked out the navigation sights, had plotted them, and the positions showed the Miss C. B. had been in the vicinity where seized for six days, from February 25th to March 2d.

The master of the Coast Guard boat Nagatuck testified that on March 2d he had trailed the schooner for some 300 miles from her approximate position as shown by Guillen's work sheets, and had left her on March 4th. The Guillen work sheets showed the trailing positions to be approximately the same as plotted by the Nagatuck, and on the 5th they showed her standing back toward position.

The testimony of the members of the Coast Guard and the master of the vessel showed her to be a well-known rumrunner, having been trailed off the Gulf Coast some six times by various Coast Guard vessels.

The proof also showed the Miss C. B. to have been within twelve miles of the coast of the United States and that she attempted to leave and was only stopped by a show of force, though the master of the vessel main-

tained he was never within twelve miles of the coast and was bound for Nassau. His testimony, however, was not convincing.

I find that when first observed, the Miss C. B. was within the twelve-mile limits of the New Orleans customs district in the immediate proximity of some other small vessel which left her going inshore, while the Miss C. B. started out to sea and was pursued by the Mahoning and overhauled after she passed the twelve-mile limit.

I find that the cargo of the Miss C. B. was altogether alcohol and alcoholic liquors, and that she came off the coast of the United States for the purpose of transhipping this cargo into small vessels to have it brought into the United States.

█ It is contended that as the vessel came within the twelve-mile limit of the New Orleans customs district and was arrested by the Coast Guard at sea off this district and carried to the mouth of the Mississippi river inside this district before she was boarded, that the prosecution can only be had in the Eastern district of Louisiana under the provisions of section 1602, title 19, USCA (Tariff Act 1930, § 602). That section requires: "Any officer, agent, or other person authorized by law to make seizures of *merchandise or baggage* subject to seizure for violation of the customs laws, to report every *such seizure* immediately to the collector for the district in which such violation occurred." (Italics mine.)

It is manifest from the reading that the reference is to seizure by customs officers of *goods or baggage* when the vessel on which it is found is in the port, and it has no bearing upon the seizure of a ship made on the high seas by Coast Guard vessels. Such seizures are provided for by section 1585, title 19, USCA, which provides: "If any vessel or vehicle from a foreign port or place arrives within the limits of any collection district and departs or attempts to depart, except from stress of weather or other necessity, without making a report or entry under the provisions of this chapter, * * * any customs or Coast Guard officer may cause such

vessel or vehicle to be arrested and brought back to the most convenient port of the United States."

Note it does not say to the port of the collection district from which it had departed or attempted to depart. This section was evidently designed to prevent smuggling.

Section 106, title 28, USCA, provides: "Proceedings on seizures made on the high seas, for forfeiture under any law of the United States, may be prosecuted in any district into which the property so seized is brought and proceedings instituted. Proceedings on such seizures made within any district shall be prosecuted in the district where the seizure is made, except in cases where it is otherwise provided."

The Abby, Fed. Cas. No. 14, Opinion by Story and a number of cases cited under this section in the Code which hold that the part of the sea below low-water mark and not within the body of any country is the high sea.

█ The seizure in this case was not made within any district but was made on the high sea; hence the place of prosecution is provided for by the first paragraph of the section. It appearing that this vessel was first brought into Mobile within the jurisdiction of this court, and proceedings were first instituted here, I hold that the libel may be maintained in this district. The Abby, supra; Gedney et al. v. L'Amistad, Fed. Cas. No. 5294.

There is no conflict between these two sections if construed so that seizures made in a port, are to be reported and prosecuted in the court having jurisdiction of such port, and seizures made on the high sea may be brought into some other convenient port, and there prosecuted.

There is no reason I can see to hold section 1602 was intended to repeal section 106, for there is a clear field within which each may operate so as to prevent conflict.

I see nothing in Maul v. U. S., 274 U. S. 501, 47 S. Ct. 735, 71 L. Ed. 1171, inconsistent with this holding.