**UNITED STATES v. 146,157 GALLONS OF ALCOHOL (Frank RIZZO, Claimant).**
**THE EVELYN.**
**THE DORIS.**
**THE HELEN.**
**Nos. 7811, 7813–7815.**

District Court, D. New Jersey.
May 5, 1933.

Harlan Besson, U. S. Atty., of Hoboken, N. J., for the United States.

Harry H. Weinberger, of Passaic, N. J., for claimant Frank Rizzo.

Samuel I. Kessler, of Newark, N. J., for claimant Matoil Service & Transport Company, Inc.

FORMAN, District Judge.

The facts in the above causes are stated to some extent in the memorandum heretofore filed herein on March 22, 1933 ([D. C.] 2 F. Supp. 911).

The matters were brought on for final hearing, and proofs were offered as to the ownership of the alcohol by the claimant Rizzo and as to the boats by the claimant Matoil Service Company, Inc.

As to the 146,157 Gallons of Alcohol.

The sole question involved here is: Has the claimant Rizzo established his status as a bona fide owner of the said alcohol?

The claimant took the stand and produced certain documents indicating the transfer to him of the charters covering these boats to-

gether with "what was on deck and below deck" as he put it.

He stated that this transaction was had with a Mr. Rogers. He paid $5,000 as an installment on a total consideration of $26,000. As part of the $5,000 installment he borrowed $1,000 from Harry Goldberg, $1,500 from Tony Lombardo, and $1,000 from Sam Calamano. The balance he paid from his own funds.

He alleged that he was the owner of the cargo aboard the Doris and in fact after his negotiations accompanied all three vessels on their voyage from Nyack to Port Johnson, in what capacity is not clear, but, as he says, "Just took a joy ride." Record, p. 483.

He produced several witnesses, employees about the dock at Port Johnson, who testified that on several occasions he was seen about the boats as if in charge, and Captain Walsh, in charge of the dock, gave it as his information that Rizzo was in charge of the boats and actually paid wharfage for them.

In response to numerous questions as to the cargo of the Doris and other particulars he replied that he refused to answer on the ground that he might incriminate himself.

The claimant's only occupation had been that of a seaman at $80 per month. He had, however, not recently pursued this calling, deriving his income from gambling at cards and on race horses.

In connection with the so-called documents of title it is important to note that the alleged assignment to the claimant reads as follows:

"(Exhibit C–17.)

"November 22, 1932.
"In consideration of the sum of one dollar and other good and valuable consideration to me in hand paid I hereby assign all my right, title and interest in the charter on the other side to Tow Barge Doris to Frank Rizzo of Bayonne, N. J.
"Rogers Oil and Supply Co.
"George Rogers, Pres.

The assignments of the charters of the other two vessels are in identical language.

Although the claimant alleges that he became possessed thereby of everything on and below decks, there is nothing in the language of the assignment indicating a transfer of the cargo to him.

He did not know the whereabouts of Mr. Rogers, who had negotiated with him concerning this cargo (the value of which might well run into the hundreds of thousands of dollars), nor did he know the whereabouts of his friends, Harry Goldberg, from whom he had borrowed $1,000, Tony Lombardo $1,500, or Sam Calamano another $1,000, notwithstanding the fact that they practically capitalized the venture for him.

The very essence of the status of the claimant is his good faith. He has sworn in his claim that he is the true and bona fide owner of this alcohol.

In substantiation of his claim he tells a weird story peopled by disappearing characters, and then, although claiming under oath the cargo of alcohol, in so many words, when cross-examined upon the subject, he seeks refuge in the stereotyped reply "I refuse to answer because it may incriminate me."

In this connection his counsel argues "that it was the plain duty of the Court to ascertain the merit of the refusal."

Counsel cites an excerpt from the decision of Chief Justice Marshall in the case of United States v. Aaron Burr, 25 Fed. Cas. page 38 et seq., case No. 14,692e but unhappily is misled by reading too meagerly from the opinion.

Following is the language of the Chief Justice, and the italicized portion is the phraseology counsel failed to quote: "When a question is propounded it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness. If this be decided in the negative, then he may answer it without violating the privilege which is secured to him by law. *If a direct answer to it may criminate himself, then he must be the sole judge what his answer would be. The court cannot participate with him in this judgment, because they cannot decide on the effect of his answer without knowing what it would be; and a disclosure of that fact to the judges would strip him of the privilege which the law allows, and which he claims. It follows necessarily then * * * that if the question be of such a description that an answer to it may or may not criminate the witness, according to the purport of that answer, it must rest with himself, who alone can tell what it would be, to answer the question or not. If, in such a case, he say upon his oath that his answer would criminate himself, the court can demand no other testimony of the fact.*"

This objection comes with rather poor grace from one craving the privilege of immunity. Here is an applicant for a large quantity of contraband objecting when the court has, without question, permitted him to avail himself of the privilege. He swears that to

answer will incriminate him, and, in view of the delicacy of the entire issue, any questions by the court might have elicited answers involving him in, not only the obvious crime, but in others as well.

After the government witnesses had testified that the claimant had stated at the time of the seizure that he was merely a watchman, he admitted that he made such a statement. He further admitted that he gave as his place of residence an address that did not exist.

His ideas on truth telling are illuminated by the following colloquy with the court (Record, p. 492, et seq.) :

"Q. Why did you tell Mr. Parnisco you were only a watchman hired about a half a day before that time and that Mr. Rogers was the owner of this ship's cargo or words to that effect? A. Mr. Rogers was the owner up until only a couple of days before that and I wanted to know how I stood before I was going to admit that I was the owner."

"Q. Do you know how you stand now? A. No, sir.

"Q. Why do you now admit something different from what you told the government officers before? A. I would like to get the cargo back if possible and the boats.

"Q. What you told the officers that time is a lie, is that right? A. Yes, sir. * * *

"Q. It makes a difference to you when you are talking whether you are under oath or not? A. Yes, sir."

Is this the type of testimony calculated to inspire the confidence of the court in the integrity or bona fides of the claim, or does it not rather demonstrate a willingness and a capacity upon the part of the claimant to say or do anything to "get the cargo back if possible and the boats," although he does not even lay claim to the latter?

With a brazen effrontery, seldom if ever exceeded or even equalled in this or any other court, the claimant makes demand for this contraband.

Confessedly a professional gambler and a liar, his testimony and his demeanor characterize him as an underworld operator, the like of which there are too many in the country today. He has, in the opinion of this court, failed entirely to establish the bona fides of his claim and he has stamped himself as unworthy of the slightest belief.

Conforming with my decision on the motion to dismiss the libel, I now find that this claimant has no status from which he can attack the same, and a decree of forfeiture will be entered against this 146,157 gallons of alcohol.

As to the Vessels Doris, Helen, and Evelyn.

The court feels that the ownership of these vessels has been definitely established in a corporation known as the Matoil Service & Transport Company, Inc. The evidence discloses a generous intracorporate arrangement whereby large financial obligations were assumed by a now absent Mr. Rogers to the very definite advantage of Captain Mathiason. Still there is no evidence impugning the good faith of the said Mathiason such as to lay the foundation for a belief that the said corporation was not the bona fide owner of these vessels.

We are therefore brought to a consideration of the question of whether there was a lawful seizure of the same.

They were taken, while tied together in dock, by the Coast Guard and customs officials, acting jointly, without a warrant, after they had been boarded and a customs officer had lifted a manhole plate and discovered the vast quantity of alcohol aboard the Doris.

The vessels are charged in the respective libels with violations of sections 584, 594, and 1, Schedule 8, par. 814, of the Tariff Act of 1930 (18 USCA § 1584, § 1594 and § 1001, par. 814, Schedule 8) and R. S. § 4377 (46 USCA § 325).

■ Customs officers, since the beginning of the government, have been charged with the enforcement of the navigation laws. The first authority to board and search vessels in this connection was contained in section 27 of the Act of February 18, 1793 (1 Stat. 305) which was an act providing for the enrollment and licensing of vessels in the coasting trade and fisheries. The said section reads as follows: "That it shall be lawful for any officer of the revenue, to go on board of any ship or vessel, whether she shall be within or without his district, and the same to inspect, search and examine, and if it shall appear, that any breach of the laws of the United States has been committed, whereby such ship or vessel, or the goods, wares and merchandise on board, or any part thereof, is, or are liable to forfeiture, to make seizure of the same." This statute was never specifically repealed. It appeared in the Revision of the United States Statutes as Drafted by the Commissioners (1872) as section 320, title 36, chapter 10. It did not, however, appear in the final draft of the revised statutes presumably because the substance thereof was contained in section 3059.

The Act of March 2, 1799 (1 Stat. 627, 668), a customs revenue law, provided in section 54 that "it shall be lawful for all collectors, naval officers, surveyors, inspectors, and the officers of the revenue cutters, herein after mentioned, to go on board of ships or vessels in any port of the United States, or within four leagues of the coast thereof, if bound to the United States, whether in or out of their respective districts, for the purposes of demanding the manifests aforesaid, and of examining and searching the said ships or vessels; and the said officers respectively shall have free access to the cabin and every other part of a ship or vessel. ˃ * * ”

Section 70 of the same act provided that: "It shall be the duty of the several officers of the customs, to make seizure of, and secure any ship, or vessel, goods, wares or merchandise which shall be liable to seizure by virtue of this or any other act of the United States, respecting the revenue, which is now, or may hereafter be enacted, as well without as within their respective districts." The said sections 54 and 70 were re-enactments of similar provisions of prior laws. The acts of February 4, and March 3, 1815 (3 Stat. 195, 231, respectively), authorized certain classes of customs officers to board, search, and examine any vessel in their own or other customs districts and to seize any merchandise subject to forfeiture by reason of attempted evasion of duty or of having been imported contrary to law.

█ On July 18, 1866, there was passed "An Act further to prevent Smuggling and for other Purposes" (14 Stat. 178), section 2 of which provided as follows: "That it shall be lawful for any officer of the customs, including inspectors and occasional inspectors, or of a revenue cutter, or authorized agent of the Treasury Department, or other person specially appointed for the purpose in writing by a collector, naval officer, or surveyor of the customs, to go on board of any vessel, as well without as within his district, and to inspect, search, and examine the same, and any person, trunk, or envelope on board, and to this end, to hail and stop such vessel if under way, and to use all necessary force to compel compliance; and if it shall appear that any breach or violation of the laws of the United States has been committed, whereby or in consequence of which, such vessel, or the goods, wares, and merchandise, or any part thereof, on board of or imported by such vessel, is or are liable to forfeiture, to make seizure of the same, or either or any part thereof, and to arrest, or in case of escape, or any attempt to

escape, to pursue and arrest any person engaged in such breach or violation. * * ˃ ”

Section 24 of the same act (see 46 USCA § 60) provided that: "If any certificate of registry, enrollment, or license, or other record or document granted in lieu thereof, to any vessel shall be knowingly and fraudulently obtained or used for any vessel not entitled to the benefit thereof, such vessel, with her tackle, apparel, and furniture, shall be liable to forfeiture."

Section 24 is a navigation law, and by its inclusion in the same act it is apparent that section 2 of the act of 1866 was intended to aid customs officers in detecting violations of the navigation laws as well as of the customs laws.

Section 2 of the act of 1866, which became section 3059 of the Revised Statutes, contained the substance of section 27 of the Act of February 18, 1793, and of section 54 of the Act of March 2, 1799, and apparently superseded them. Nevertheless, the substance of section 54 was for some reason incorporated in the Revised Statutes as section 3067. Section 3059 is somewhat broader than section 3067, in that the right to board and search is not confined to vessels bound to the United States, and it provides for seizure in the event reasons for forfeiture are discovered. Both sections were superseded by section 581 of the Tariff Act of 1930 (19 USCA § 1581).

It will be seen that none of the statutes above mentioned imposes any express restriction as to the purposes for which vessels may be boarded and searched by customs officers. It may be argued that there is an implied restriction, that is, that the right to board and search may be exercised by customs officers only within the scope of their duties, but this does not prevent the exercise of the right for the purpose of enforcing the navigation laws, for that is part of the duties of customs officers and such right has been exercised by them in this behalf since the foundation of the government. Customs officers have from time immemorial been charged specifically or by implication with the enforcement of many and various laws besides those pertaining solely to the protection of the revenue.

But even though it were held that because the specific authority to board and search has, with one or two exceptions, been contained in laws primarily for the protection of the revenue, and that, therefore, such right can be exercised only for the purpose of protecting the revenue, the Supreme Court has held that the navigation laws are laws "respecting the

revenue," within the meaning of section 3072, Rev. St. (19 USCA § 506). Maul v. United States, 274 U. S. 501, 47 S. Ct. 735, 738, 71 L. Ed. 1171. In this connection the court stated that: "The sections violated are found in a subdivision of the Revised Statutes entitled 'Regulation of Vessels in Domestic Commerce,' but the arrangement of sections in the revision is without special significance. Rev. St. § 5600 (Comp. St. § 10597). That subdivision includes several provisions designed to regulate commerce by vessels and also to protect the revenue, *these being related subjects.* A reading of the sections violated in connection with others in the same subdivision makes it plain that they are directed to the protection of the revenue; and therefore they come within the terms of section 3072. That they are also regulations of commerce by vessels does not make them any the less laws respecting the revenue."

Section 5600, Revised Statutes, referred to in the above quotation, reads as follows: "The arrangement and classification of the several sections of the revision have been made for the purpose of a more convenient and orderly arrangement of the same, and therefore no inference or presumption of a legislative construction is to be drawn by reason of the Title, under which any particular section is placed."

The following language of the Supreme Court in Gelston v. Hoyt, 3 Wheat. 246, 311, 4 L. Ed. 381, is significant as throwing light upon the construction of section 581: "The act of the 2d of March 1799, ch. 128, § 70, makes it the duty of the several officers of the customs, to make seizure of all vessels and goods liable to seizure by virtue of any act of the United States respecting the revenue; and assuming the statute of 1794, ch. 50, not to be a revenue law, within the meaning of this clause, still the case falls within the broader language of the act of the 18th of February 1793, ch. 8, § 27, which authorizes the officers of the revenue to make seizure of any ship or goods, where any breach of the laws of the United States has been committed."

As stated above, the substance of section 27 of the Act of 1793, which was incorporated in section 3059 of the Revised Statutes, was continued in section 581 of the present tariff act as follows:

"Officers of the customs or of the Coast Guard, and agents or other persons authorized by the Secretary of the Treasury, or appointed for that purpose in writing by a collector may at any time go on board of any vessel or vehicle at any place in the United States or within four leagues of the coast of the United States, without as well as within their respective districts, to examine the manifest and to inspect, search, and examine the vessel or vehicle, and every part thereof, and any person, trunk, or package on board, and to this end to hail and stop such vessel or vehicle, if under way, and use all necessary force to compel compliance, and if it shall appear that any breach or violation of the laws of the United States has been committed, whereby or in consequence of which such vessel or vehicle, or the merchandise, or any part thereof, on board of or imported by such vessel or vehicle is liable to forfeiture, it shall be the duty of such officer to make seizure of the same, and to arrest, or, in case of escape or attempted escape, to pursue and arrest any person engaged in such breach or violation.

"Officers of the Department of Commerce and other persons authorized by such department may go on board of any vessel at any place in the United States or within four leagues of the coast of the United States and hail, stop, and board such vessels in the enforcement of the navigation laws and arrest or, in case of escape or attempted escape, pursue and arrest any person engaged in the breach or violation of the navigation laws." 19 USCA § 1581.

Moreover, this re-enactment of section 581 of the act of 1922 provides without qualification that officers of the customs may go on board any vessel at any time and at any place in the United States, or within four leagues of the coast thereof, "to inspect, search, and examine the vessel." As this provision of law contains no restriction on the right to board and search, and the enforcement of the navigation laws is a part of the regular duties of customs officers, it would seem that any attempt to prohibit the exercise of this authority for the purpose of enforcing the navigation laws would be judicial legislation.

The only possible restriction on the authority is the Fourth and Fifth Amendments to the Constitution prohibiting unreasonable searches and seizures and securing a defendant in a criminal case from being compelled to be a witness against himself.

■ This, after all, is not a criminal proceeding but an action in rem.

"Forfeiture under the Revised Statutes, § 4377, for breach of the navigation laws, is strictly in rem, and is not dependent upon a preliminary adjudication of personal guilt."

U. S. v. The Ruth Mildred, 286 U. S. 67, 52 S. Ct. 473, 474, 76 L. Ed. 981.

The personnel of the Coast Guard has similar status with officers of the customs service. Maul v. U. S., 274 U. S. 501, 47 S. Ct. 735, 71 L. Ed. 1171.

In the case at bar the government officials had received a communication regarding these vessels, and pursuant thereto they proceeded to them for the purpose of inspecting them. The vessels were American vessels enrolled or licensed for the coasting trade. They were tied together and moored at a dock in this district.

The officers, clothed with the authority given them under the statutes aforesaid, went aboard these vessels and found upon inspection the violations of the law.

There was nothing unreasonable in this action. This was no search through a man's home for the purpose of seizing his private papers, but a necessary inspection inherently an attribute of the sovereignty of the government.

In Boyd v. U. S., 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746, Mr. Justice Bradley used language which is of particular significance and applicability here. It was there said (page 623 of 116 U. S., 6 S. Ct. 524, 528, 29 L. Ed. 746): "The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him. The two things differ toto cœlo. In the one case, the government is entitled to the possession of the property; in the other it is not. The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the government. The first statute passed by congress to regulate the collection of duties, the act of July 31, 1789, (1 St. 29, 43,) contains provisions to this effect. As this act was passed by the same congress which proposed for adoption the original amendments to the constitution, it is clear that the members of that body did not regard searches and seizures of this kind as 'unreasonable,' and they are not embraced within the prohibition of the amendment."

Again, in Carroll v. U. S., 267 U. S. 132 at page 153, 45 S. Ct. 280, 285, 69 L. Ed. 543, 39 A. L. R. 790, Mr. Chief Justice Taft, speaking for the court, says:

"We have made a somewhat extended reference to these statutes to show that the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon or automobile * * * where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

"Having thus established that contraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant, we come now to consider under what circumstances such search may be made. It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor, and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in."

Also, cited with approval in the Carroll Case, on the question of probable cause: The Apollon, 9 Wheat. 362, 6 L. Ed. 111, Mr. Justice Story, who delivered the judgment of the court, said (page 374 of 9 Wheat., 6 L. Ed. 111): "It has been very justly observed at the bar, that the court is bound to take notice of public facts and geographical positions; and that this remote part of the country has been infested, at different periods, by smugglers, is matter of general notoriety, and may be gathered from the public documents of the government."

So here this court cannot shut its eyes to the highly convenient aspect of the New Jersey coast line as an attractive haven for those seeking to evade the laws prohibiting the landing of contraband alcohol.

If the contention prevails that customs and Coast Guard officers may not exercise the authority conferred upon them by section 581, Tariff Act of 1930 (19 USCA § 1581), without having probable cause there-

for or a search warrant, it will follow that the Coast Guard and customs officers are precluded from making any inspection of American vessels for violation of any law. They may not then inspect vessels for the purpose of determining whether foreign goods are on board; or to demand, inspect, and verify manifests of vessels; or to inspect vessels to determine whether their documents are in order, have not expired, and are the documents which have been issued for the vessel boarded; or to inspect for violations of immigration laws; or to enforce provisions of navigation laws, relative to equipment and radio; or to enforce provisions of navigation and passenger laws which aim to prevent overcrowding, presence of faulty unsatisfactory equipment on board, the operation of vessels by others than duly licensed officers, operation of unseaworthy vessels, violations of Seamen's Act which provides for a certain percentage of American seamen on board.

If the Coast Guard and customs officers are prevented from making thorough inspection of American vessels, it will mean that the smugglers of contraband, narcotics, liquor, stowaways, foreign merchandise, dutiable and free, prohibited importations, such as infected plants, fruits, etc., or owners of privateers, the masters of filibusters, need only maintain an outward air of respectability and legality to escape discovery, and it will surround them with and assure them of an immunity that was never intended.

It will mean a breaking down of the tariff laws upon which the government depends for the revenue with which to maintain the functions of the government and the credit of the United States.

If such power does not rest in the properly constituted authorities nothing can prevent a shipowner or charterer from storing dynamite, high explosives, etc., aboard his boat at Port Johnson, safe from the scrutiny of any officer charged by law to regulate such storage and traffic.

An American tug could bring the bubonic plague and other infectious diseases into the country and escape discovery.

To hold less would extend to privileged violators of the law an advantage over honest importers who pay their lawful customs duties and penalize legitimate shipowners who comply with the laws of the United States.

A large quantity of alcohol was found aboard the barge Doris. Only insignificant quantities were found upon the other barge Helen and upon the motor oil screw Evelyn. It is, however, apparent from the evidence that the Doris and Helen, being without motive power, were towed by the Evelyn.

All were licensed in the coasting trade.

Each of their documents provided as follows: "License * * * Conrad Mathiason the Master, having sworn that he is citizen of the United States and that this license was not to be used for any other vessel or for any other employment as herein specified or in any trade or business whereby the revenue of the United States may be defrauded." (See foot of Consolidated Enrollment and License Certificate Exhibits G–1, G–2 and G–3.)

The transportation or the storage of the alcohol found thereon was in violation of their license. The presence of the alcohol on board was not defended or explained by the production of any evidence that the same was legally thereon.

In the case of The Esther M. Rendle (C. C. A.) 7 F.(2d) page 545, and Id. (C. C. A.) 13 F.(2d) 839, 840, the court said: "Although the tug was licensed to engage in coastwise trade, its employment in illegal trade or traffic, whether coastwise or foreign, would subject it to forfeiture under R. S. § 4377 [46 USCA § 325], as being employed in trade other 'than that for which she is licensed.' * * * "

And, in The Dante (D. C.) 17 F.(2d) 304, 305, the following appears: "The opinions in The Esther M. Rendle, 13 F.(2d) 839 (No. 1950, decided in the October term, 1925, by the United States Circuit Court of Appeals, First Circuit), and also in The Underwriter (C. C. A.) 13 F.(2d) 433; The Resolution, Fed. Cas. No. 11,709; [U. S. v.] The Mars (C. C. Mass.) Fed. Cas. No. 15,723; U. S. v. One Black Horse (D. C.) 147 F. 770; United States v. One Buick Automobile (D. C.) 300 F. 584; Goldsmith [Jr.-] Grant Company v. United States, 254 U. S. 505, 41 S. Ct. 189, 65 L. Ed. 376—cited on behalf of the government, are persuasive here that innocence or want of knowledge of the use to which the offending thing is put is beside the question. It is the illegal use which works the forfeiture prescribed by this and other such quasi penal statutes; the innocence or guilt of the owner being accidental."

The action taken by the government officers against these three boats was logical and legal. They had authority to board the boats, and their search was not unreasonable. The result of such search warranted the seizure which they made. The court fails to find that the owner of the vessels was deprived of any constitutional rights by such reasonable

search, and hence it follows that all of the vessels should be forfeited and appropriate decrees may be taken accordingly.