UNITED STATES v. ONE ARTICLE OF DEVICE LABELED SPECTRO-CHROME et al.

Civil Action No. 2855.

District Court, D. Oregon.

April 4, 1946.

On the Merits May 22, 1946.

Henry L. Hess, U. S. Atty., and J. Robert Patterson, Asst. U. S. Atty., both of Portland, Or., and Joseph L. Maguire, Atty., Federal Security Agency, of Washington, D. C., for libelant.

Barnett H. Goldstein, of Portland, Or., for claimant.

McCOLLOCH, District Judge.

Because I was told that the Department of Justice was making this a test case for many similar cases throughout the country, I took some time before ruling, although it seemed plain to me at the outset that defendant's constitutional rights had been invaded.

Defendant has purchased a Spectro-Chrome for the use of himself and his mother. The prospectus promises many cures. A color, or a combination of colors, will cure this, another combination of color will cure that. In proceedings against the manufacturer, the Government obtained a judgment that the machine was fraudulent and, because this machine was shipped in interstate commerce, the Government claims the right to take it from defendant, though he has bought and paid for it and is using it in his home. In fact, the Marshal now has the machine in his possession, and this is a motion by the Government for permission to dismantle the machine for examination.

On what conceivable basis, under our Constitutional guaranties, can the Government deny to an adult individual the right to believe in and seek to cure himself of physical ailments by any means he chooses, so long as the means chosen is not inherently dangerous or harmful? I know many people who wear charms, including some

who carry the lowly potato, to keep disease away, and I had always thought they had the right to do this. Incidentally, I have no doubt that many get help in this manner.

I have not mentioned the special guaranties afforded by our law against intrusion into the home. This ground, I feel confident, could be shown to be sufficient to denounce the seizure in this case as unlawful.

Since writing what is above, I have been advised that the Government is contemplating dismissing the case and returning the Spectro-Chrome to defendant's home. If that is done, it is likely that nothing more will need to be said.

The Government's motion is denied.[1]

### On the Merits

This case, having now been tried on the merits, revives the question, whether an inanimate object, inherently non-dangerous, which the owner thinks has therapeutic value, can be taken from him and his home, under process, pursuant to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 301 et seq.

It has been stipulated that the device was shipped in interstate commerce, labeled with false and misleading statements as to its therapeutic capabilities. Regardless, the owner testified that he was satisfied with the machine and wanted to keep it, and that he and his mother had both obtained help for certain disorders, by using the machine. He testified further that he did not intend to make commercial use of the machine, did not intend to permit it to be used outside of his home, or by others than his immediate family, which consists of his parents and two brothers, both over twenty-one years of age and both having had the same education as Claimant, in the grammar and high schools of

the city of Portland, Oregon. The Claimant is twenty-three years old and was employed during the war in aircraft production, where he made use of the education which he had received in a technical high school.

The Government relies on the words of the statute, that an article introduced into interstate commerce, with fraudulent representations as to its therapeutic value, may be seized and condemned "while in interstate commerce, *or at any time thereafter* * * *." 21 U.S.C. Sec. 334(a), 21 U.S.C.A. § 334(a). The italicized words, the Government contends, permit it to pursue and seize the article and the literature containing the misleading statements, in a private home.

As shown by an earlier memorandum, the article was seized by the Marshal on initial process, but I must now add that prior to the trial on the merits, just concluded, and subsequent to the preliminary memorandum, I directed that the Spectro-Chrome be returned to Claimant's home[2]—so that the case might present, as it now does, the clear cut issue, whether an instrument, harmless in itself, but accompanied by misleading literature as to its capabilities, may be seized against his will from an adult male person, compos, who states that he is satisfied with the machine, is being helped by its use, and wishes to keep it.

I think this issue has not before been directly presented, and I think, as Judge Cooley said many years ago, that the approach should be—does the case constitute an exception to the general rule, that the citizen's home is his castle, the security of which he may defend against all trespass? The Government has a heavy burden to establish the exception.

---

[1] A valuable compilation of all of the Federal statutes providing for seizure is to be found in a note by Mr. Justice Brandeis, concurring in Maul v. United States, 274 U.S. 501, 518, 47 S.Ct. 735, 71 L.Ed. 1171 n. 21. And see a similar compilation by Mr. Justice Frankfurter in an appendix to his dissenting opinion in Davis v. U. S., 66 S.Ct. 1273.

[2] The Government felt, I believe, that I had destroyed jurisdiction in the case, when I directed the Marshal to return the Spectro-Chrome to Claimant pending trial. The analogy of Admiralty practice, where it is customary to permit a Claimant to resume possession of the seized article, by giving bond pending trial, indicates that the Government's position is not well taken. See 2 Benedict on Admiralty, 16th Ed., Sec. 368.

"Near in importance to exemption from any arbitrary control of the person is that maxim of the common law which secures to the citizen immunity in his home against the prying eyes of the government, and protection in person, property, and papers against even the process of the law, except in a few specified cases. * * *." (p. 425)

"* * * it would generally be safe * * * to regard all those searches and seizures 'unreasonable' which have hitherto been unknown to the law, and on that account to abstain from authorizing them, leaving parties and the public to the accustomed remedies." (p. 433)

Constitutional Limitations, 7th Ed.

▇▇ This case does not present such an exception.[3] The case is nothing more than a well intentioned effort by high-minded and zealous officials to protect a man from what they deem to be folly, to the extent of following him into his home and family and there divesting him of property. This cannot be done, and I regret that I find myself in dissent from those Districts where, in connection with the nation-wide campaign to retrieve Spectro-Chrome machines, wherever found, contempt orders have been issued to private owners to compel delivery for condemnation.

To me, the wisdom of the ages means nothing if this humble citizen can be compelled, against his will, to yield access to his home to Federal officers to take from him and destroy a mechanical object, perfectly harmless in itself, which he thinks (whether rightly or wrongly makes no difference) is beneficial to him. My conception of the meaning of the Fourth Amendment is, that the citizen alone can unlock the doors to his dwelling, except in the rarest cases, and this is not one of the exceptions. Coke is credited with the maxim that "An Englishman's home is his castle". This is morticed into the Fourth Amendment of our National Bill of Rights, and I cannot resist adding the imperishable words by Chatham, of a later English generation:

"The poorest man may, in his cottage, bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement."

The Right to Prescribe for Oneself[4]

▇▇ Turning to the other major question in the case, no authority has been shown to me that supports the position of the Government, which, while admitting the Spectro-Chrome is not inherently dangerous, says in its brief: "It is claimed to be indirectly dangerous because the ailment of the user is aggravated by reason of the failure to consult competent medical authority."

This is admirable frankness on the part of the Government, but, as stated, it is sup-

---

[3] Davis v. U. S., 66 S.Ct. 1256, is an exhaustive consideration of all phases of search and seizure.

Oklahoma Press Pub. Co. v. Walling, 66 S.Ct. 494, deals with seizure of documents in civil proceedings.

The Constitutional guaranties are not limited to criminal proceedings, as the Government seemed inclined to urge at the trial. At common law, an officer might not enter a dwelling, without the consent of the owner, for the purpose of serving a civil writ or process. 21 Am. Jur. Secs. 131, 136; 57 A.L.R. 211, Note; 129 A.L.R. 247, .Note. Takahashi & Osawa v. United States, 9 Cir., 143 F.2d 118, an opinion by my colleague, Judge Fee, is one of the leading cases of recent years in this field. What might be called the Holmes—Brandeis law was made in the prohibition era. The enforcement policies of wartime agencies have raised Constitutional issues in this field anew.

[4] The makers of our Constitution "conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men."

These words by Mr. Justice Brandeis, taken from the dissenting opinion of the Justice in Olmstead v. United States, 277 U.S. 438 at 478, 48 S.Ct. 564, 572, 72 L.Ed. 944, 66 A.L.R. 376, are quoted by Mr. Frank E. Holman, a senior member of the Seattle bar, in an outstanding article published in the April 1946 number of the American Bar Association Journal, beginning at page 190.

ported by no authority, and I venture that it can be supported by none. I hesitate to labor the point, in opposition to this claim of paternal right to control the manner in which a person shall seek to cure himself. So many years, generations now, have been devoted to demonstrating that man is often his own best doctor, aside from the question of terrific import, of personal liberty, involved—it would be but stirring old waters, long calm, to review the successful struggle of healing groups and faiths, unconventional in their time for freedom from governmental interference.

More than the right of group action, tremendously more, is here involved—the right of the individual to select his own manner and means of treatment. The question is not, whether false and misleading statements were made to Claimant. The question is, what does he want to do about it? He says: "Nothing. I am satisfied. I am being helped." But the Government answers: "We won't allow you to be satisfied. We won't allow you to help yourself. We know that you *may* be led into doing yourself harm, through relying too heavily on this machine, and thus not obtaining proper (by our standards) medical treatment." Without intending to give offense, I think no such proposition of paternal right in the field of public health has been advanced in modern times. At least I have been unable to find it in encyclopedias, treatises or law books.

### Conclusion

An easy way of disposing of this case would have been to hold that the attempt to stretch the Government's power of seizure and condemnation under the commerce clause to an article in the hands of the ultimate consumer, raised grave constitutional questions which forbade such construction, Federal Trade Commission v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, 32 A.L.R. 786, but I have preferred to meet head-on and to discuss the questions of security of one's dwelling and of personal liberty, which I regard as the true issues in the case. I have done this, because I gained the impression during the war, and the impression has been strength-ened since hostilities ended, that it is time for Federal judges to dust off the Constitution.

Judgment will be for the Claimant.