# Deployment of United States Armed Forces into Haiti

The President possessed the legal authority to deploy United States Armed Forces into Haiti

The planned deployment accorded with the sense of Congress, satisfied the requirements of the War Powers Resolution, and was not a "war" within the meaning of the Constitution.

September 27, 1994

LETTER OPINION FOR FOUR UNITED STATES SENATORS

I write in response to your letter of September 15, 1994, in which you requested a copy or summary of any legal opinion that may have been rendered, orally or in writing, by this Office concerning the lawfulness of the President's planned deployment of United States military forces into Haiti. After giving substantial thought to these abiding issues of Presidential and congressional authority, we concluded that the President possessed the legal authority to order that deployment.

In this case, a combination of three factors provided legal justification for the planned deployment. First, the planned deployment accorded with the sense of Congress, as expressed in section 8147 of the Department of Defense Appropriations Act, 1994, Pub. L. No. 103-139, 107 Stat. 1418, 1474 (1993) ("Defense Appropriations Act"). That resolution expressed Congress's sense that the President would not require express prior statutory authorization for deploying troops into Haiti provided that he first made certain findings and reported them to Congress. The President did make the required findings and reported them. We concluded that the resolution "evince[d] legislative intent to accord the President broad discretion" and "'invite[d]' 'measures on independent presidential responsibility.'" *Dames & Moore v. Regan*, 453 U.S. 654, 678 (1981) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)). Second, the planned deployment satisfied the requirements of the War Powers Resolution. Finally, after examining the circumstances, nature, scope, and duration of the anticipated deployment, we determined that it was not a "war" in the constitutional sense. Specifically, the planned deployment was to take place with the full consent of the legitimate government, and did not involve the risk of major or prolonged hostilities or serious casualties to either the United States or Haiti. For those reasons, which are set out in detail below, we concluded that the President had legal and constitutional authority to order United States troops to be deployed into Haiti.

173

## I.

First, the Haitian deployment accorded with the sense of Congress, as expressed in section 8147 of the Defense Appropriations Act.[1] That provision was sponsored by, among others, Senators Dole, Simpson and Thurmond. *See* 139 Cong. Rec. S14,021-22 (daily ed. Oct. 20, 1993).

Section 8147(b), 107 Stat. at 1474, of the Act states the sense of Congress that "funds appropriated by this Act should not be obligated or expended for United States military operations in Haiti" unless certain conditions (including, in the alternative, prior Congressional authorization) were met. Section 8147(c), 107 Stat. at 1475, however, added that

> [i]t is the sense of Congress that the limitation in subsection (b) should not apply if the President reports in advance to Congress that the intended deployment of United States Armed Forces into Haiti—
>
>> (1) is justified by United States national security interests;
>>
>> (2) will be undertaken only after necessary steps have been taken to ensure the safety and security of United States Armed Forces, including steps to ensure that United States Armed Forces will not become targets due to the nature of their rules of engagement;
>>
>> (3) will be undertaken only after an assessment that—
>>
>>> (A) the proposed mission and objectives are most appropriate for the United States Armed Forces rather than civilian personnel or armed forces from other nations, and

---

[1] In speaking of the deployment, we should be understood to include, not only the actual deployment begun on September 19, but also the military operation that was planned, and in part initiated, before an agreement with the Haitian military leadership was negotiated on September 18 by former President Jimmy Carter, Senator Sam Nunn and General Colin Powell (the "September 18 agreement"). As the President noted in his televised address of September 18, that agreement "was signed after Haiti received evidence that paratroopers from our 82nd Airborne Division, based at Fort Bragg, North Carolina, had begun to load up to begin the invasion which I had ordered to start this evening." *Text of Clinton's Address*, The Washington Post, Sept 19, 1994, at A17

(B) that the United States Armed Forces pro-
posed for deployment are necessary and sufficient to
accomplish the objectives of the proposed mission;

(4) will be undertaken only after clear objectives
for the deployment are established;

(5) will be undertaken only after an exit strategy
for ending the deployment has been identified; and

(6) will be undertaken only after the financial
costs of the deployment are estimated.

In short, it was the sense of Congress that the President need not seek prior
authorization for the deployment in Haiti provided that he made certain specific
findings and reported them to Congress in advance of the deployment. The Presi-
dent made the appropriate findings and detailed them to Congress in conformity
with the terms of the resolution. *See* Letter to the Speaker of the United States
House of Representatives from the President (Sept. 18, 1994). Accordingly, this is
not, for constitutional purposes, a situation in which the President has "take[n]
measures incompatible with the expressed or implied will of Congress," *Young-
stown*, 343 U.S. at 637 (Jackson, J., concurring). Rather, it is either a case in
which the President has acted "pursuant to an . . . implied authorization of Con-
gress," so that "his authority is at its maximum," *id.* at 635, or at least a case in
which he may "rely upon his own independent powers" in a matter where Congress
has "enable[d], if not invite[d], measures on independent presidential responsibil-
ity." *Id.* at 637.

## II.

Furthermore, the structure of the War Powers Resolution ("WPR") recognizes
and presupposes the existence of unilateral presidential authority to deploy armed
forces "into hostilities or into situations where imminent involvement in hostilities
is clearly indicated by the circumstances." 50 U.S.C. § 1543(a)(1). The WPR
requires that, in the absence of a declaration of war, the President must report to
Congress within forty-eight hours of introducing armed forces into such circum-
stances and must terminate the use of United States armed forces within sixty days
(or ninety days, if military necessity requires additional time to effect a withdrawal)
unless Congress permits otherwise. *Id.* § 1544(b). This structure makes sense only
if the President may introduce troops into hostilities or potential hostilities without

prior authorization by the Congress: the WPR regulates such action by the President and seeks to set limits to it.[2]

To be sure, the WPR declares that it should not be "construed as granting any authority to the President with respect to the introduction of United States Armed Forces into hostilities or into situations wherein involvement in hostilities is clearly indicated by the circumstances." 50 U.S.C. § 1547(d)(2). But just as clearly, the WPR *assumes* that the President already has such authority, and indeed the WPR states that it is not "intended to alter the constitutional authority of the . . . President." *Id.* § 1547(d)(1). Furthermore, although the WPR announces that, in the absence of specific authorization from Congress, the President may introduce armed forces into hostilities only in "a national emergency created by attack upon the United States, its territories or possessions, or its armed forces," *id.* § 1541(c), even the defenders of the WPR concede that this declaration — found in the "Purpose and Policy" section of the WPR — either is incomplete or is not meant to be binding. *See, e.g.,* Cyrus R. Vance, *Striking the Balance: Congress and the President Under the War Powers Resolution,* 133 U. Pa. L. Rev. 79, 81 (1984).[3]

The WPR was enacted against a background that was "replete with instances of presidential uses of military force abroad in the absence of prior congressional approval." *Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization,* 4A Op. O.L.C. 185, 187 (1980). While Congress obviously sought to structure and regulate such unilateral deployments,[4] its overriding interest was to prevent the United States from being engaged, without express congressional authorization, in major, prolonged conflicts such as the wars in Vietnam and Korea, rather than to prohibit the President from using or threatening to use troops to achieve important diplomatic objectives where the risk of sustained military conflict was negligible.

---

[2] It should be emphasized that this Administration has not yet had to face the difficult constitutional issues raised by the provision of the WPR, 50 U.S.C § 1544(b), that requires withdrawal of forces after sixty days involvement in hostilities, absent congressional authorization.

[3] The WPR omits, for example, any mention of the President's power to rescue Americans; yet even the Comptroller General, an agent of Congress, has acknowledged both that "the weight of authority" supports the position that "the President does possess some unilateral constitutional power to use force to rescue Americans," and that § 1541(c) "does not in a strict sense operate to restrict such authority." 55 Comp Gen 1081, 1083, 1085 (1976) *See also* Peter Raven-Hansen and William C. Banks, *Pulling the Purse Strings of the Commander in Chief,* 80 Va. L. Rev. 833, 879 (1994) ("[a] custom of executive deployment of armed force for rescue and protection of Americans abroad has developed at least since 1790"); *id.* at 917-18 ("[s]ince 1868 the so-called Hostage Act has authorized and required the President to 'use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate [the] release' of American citizens 'unjustly deprived of [their] liberty by or under the authority of any foreign government.' . [T]he Hostage Act lends further support to custom and may constitute congressional authorization for at least this limited defensive war power")

[4] Even though the President has the inherent power to deploy troops abroad, including into situations of hostilities, Congress may, within constitutional limits, regulate the exercise of that power *See, e.g., Santiago v Nogueras,* 214 U S 260, 266 (1909) (President had power to institute military government in occupied territories until further action by Congress); *The Thomas Gibbons,* 12 U.S (8 Cranch) 421, 427-28 (1814).

Further, in establishing and funding a military force that is capable of being projected anywhere around the globe, Congress has given the President, as Commander in Chief, considerable discretion in deciding how that force is to be deployed.[5] *See Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950); *cf. Maul v. United States*, 274 U.S. 501, 515-16 (1927) (Brandeis and Holmes, JJ., concurring) (President "may direct any revenue cutter to cruise in any waters in order to perform any duty of the service"). By declining, in the WPR or other statutory law, to prohibit the President from using his conjoint statutory and constitutional powers to deploy troops into situations like that in Haiti, Congress has left the President both the authority and the means to take such initiatives.

In this case, the President reported to Congress, consistent with the WPR, that United States military forces, together with units supplied by foreign allies, began operations in Haitian territory, including its territorial waters and airspace. The President stated in his report that he undertook those measures "to further the national security interests of the United States; to stop the brutal atrocities that threaten tens of thousands of Haitians; to secure our borders; to preserve stability and promote democracy in our hemisphere; and to uphold the reliability of the commitments we make, and the commitments others make to us, including the Governors Island Agreement and the agreement concluded on September 18 in Haiti." Letter to the Speaker of the United States House of Representatives from the President at 2 (Sept. 21, 1994). We believed that the deployment was fully consistent with the WPR, and with the authority Congress reserved to itself under that statute to consider whether affirmative legislative authorization for the continuance of the deployment should be provided.

## III.

Finally, in our judgment, the Declaration of War Clause, U.S. Const. art. I, § 8, cl. 11 ("[t]he Congress shall have Power . . . [t]o declare War"), did not of its own force require specific prior congressional authorization for the deployment of troops at issue here. That deployment was characterized by circumstances that sufficed to show that the operation was not a "war" within the meaning of the Declaration of War Clause.[6] The deployment was to have taken place, and did in fact take place, with the full consent of the legitimate government of the country

---

[5] We recognize, of course, that the WPR provides that authority to introduce the armed forces into hostilities or situations where hostilities are clearly indicated may not be inferred from an appropriation act, unless that statute "states that it is intended to constitute specific statutory authorization within the meaning of this chapter " *50 U S C* § 1547(a)

[6] *See* Note, *Congress, The President, And The Power To Commit Forces To Combat*, 81 Harv. L Rev. 1771, 1790 (1968) (describing other limited interventions and suggesting conclusion that "'war' in the sense of article 1, section 8, requiring congressional sanction, does not include interventions to maintain order in weak countries where a severe contest at arms with another nation is not likely to result"). Here, of course, there is still less reason to consider the deployment a "war," since it was undertaken at the request of the recognized, democratically-elected government, and not merely to "maintain order."

involved.[7] Taking that and other circumstances into account, the President, together with his military and intelligence advisors, determined that the nature, scope, and duration of the deployment were not consistent with the conclusion that the event was a "war."

In reaching that conclusion, we were guided by the initial premise, articulated by Justice Robert Jackson, that the President, as Chief Executive and Commander in Chief, "is exclusively responsible" for the "conduct of diplomatic and foreign affairs," and accordingly that he may, absent specific legislative restriction, deploy United States armed forces "abroad or to any particular region." *Johnson v. Eisentrager*, 339 U.S. at 789. Presidents have often utilized this authority, in the absence of specific legislative authorization, to deploy United States military personnel into foreign countries at the invitation of the legitimate governments of those countries. For example, during President Taft's Administration, the recognized government of Nicaragua called upon the United States to intervene because of civil disturbance. According to President Taft, "[t]his led to the landing of marines and quite a campaign . . . . This was not an act of war, because it was done with the consent of the lawful authorities of the territory where it took place." William Howard Taft, *The Presidency* 88-89 (1916).[8]

In 1940, after the fall of Denmark to Germany, President Franklin Roosevelt ordered United States troops to occupy Greenland, a Danish possession in the North Atlantic of vital strategic interest to the United States. This was done pursuant to an agreement between the United States and the Danish Minister in Washington, and was welcomed by the local officials on Greenland.[9] Congress was not consulted or even directly informed. *See* James Grafton Rogers, *World Policing and the Constitution* 69-70 (1945). Later, in 1941, the President ordered United States troops to occupy Iceland, an independent nation, pursuant to an agreement between himself and the Prime Minister of Iceland. The President relied upon his authority as Commander in Chief, and notified Congress only after the event. *Id.* at 70-71. More recently, in 1989, at the request of President Corazon Aquino, President Bush authorized military assistance to the Philippine government to suppress a coup attempt. *Pub. Papers of George Bush* 1615 (1989).

Such a pattern of executive conduct, made under claim of right, extended over many decades and engaged in by Presidents of both parties, "evidences the existence of broad constitutional power." 4A Op. O.L.C. at 187.

We are not suggesting, however, that the United States cannot be said to engage in "war" whenever it deploys troops into a country at the invitation of that coun-

---

[7] Moreover, the deployment accorded with United Nations Security Council Resolution No 940 (1994). There can thus be no question but that the deployment is lawful as a matter of international law

[8] President Grover Cleveland had also opined that a "military demonstration" on the soil of a foreign country was not an "act of war" if it was "made either with the consent of the [foreign] government . or for the *bona fide* purpose of protecting the imperiled lives and property of citizens of the United States " 9 *Messages and Papers of the Presidents 1789-1897*, at 466 (James Richardson ed , 1898).

[9] The Danish King and ministers were in German hands at the time

try's legitimate government. Rather, we believe that "war" does not exist where United States troops are deployed at the invitation of a fully legitimate government in circumstances in which the nature, scope, and duration of the deployment are such that the use of force involved does not rise to the level of "war."

In deciding whether prior Congressional authorization for the Haitian deployment was constitutionally necessary, the President was entitled to take into account the anticipated nature, scope, and duration of the planned deployment, and in particular the limited antecedent risk that United States forces would encounter significant armed resistance or suffer or inflict substantial casualties as a result of the deployment.[10] Indeed, it was the President's hope, since vindicated by the event, that the Haitian military leadership would agree to step down before exchanges of fire occurred. Moreover, while it would not be appropriate here to discuss operational details, other aspects of the planned deployment, including the fact that it would not involve extreme use of force, as for example preparatory bombardment, were also relevant to the judgment that it was not a "war."

On the basis of the reasoning detailed above, we concluded that the President had the constitutional authority to deploy troops into Haiti even prior to the September 18 agreement.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[10] Although the President found that the deployment would not be without risk, he and his senior advisers had also determined that the United States would introduce a force of sufficient size to deter armed resistance by the Haitian military and thus to hold both United States and Haitian casualties to a minimum The fact that the United States planned to deploy up to 20,000 troops is not in itself dispositive on the question whether the operation was a "war" in the constitutional sense, since the very size of the force was designed to reduce or eliminate the likelihood of armed resistance.